## IN RE HEATHER L. ET AL.*

Superior Court, Judicial District of Middlesex, Child Protection Session

Memorandum filed March 30, 2004

* Thus titled in accordance with the spirit and intent of General Statutes § 46b-124 and Practice Book § 32a-7.

Affirmed. *In re Heather L.*, 274 Conn. 174, 874 A.2d 796 (2005).

*Michael J. McAndrews*, for the respondent father.

*Marcia McCormack*, for the respondent mother.

*Roger E. Chiasson II*, for the minor children.

*Susanne D. McNamara*, guardian ad litem, for the minor children.

*Carrie B. Taylor*, assistant attorney general, for the petitioner.

TROMBLEY, J. This case arises out of petitions filed with the Superior Court for Juvenile Matters in New Britain on September 20, 2002, by the petitioner, the commissioner of children and families (commissioner), in which the commissioner seeks the termination of the parental rights of the respondent mother and the respondent father as to their minor children, H, who was born on February 24, 1996, and is currently eight years of age, and L, who was born on October 15, 1997, and is currently six years of age.

The commissioner claims, as a basis for the termination of the respondent father's parental rights, three of the statutory grounds provided in General Statutes § 17a-112 (j) (3). The commissioner alleges that the children have been abandoned by the respondent father, that the respondent father has failed to rehabilitate himself and that there is no ongoing parent-child relationship between the two children and the respondent father.

As to the respondent mother, the commissioner had alleged that she failed to rehabilitate herself within the meaning of § 17a-112 (j) (3) (B) (ii). The respondent mother, however, consented to the termination of her parental rights on the third and final day of the trial, after this court conducted a full canvass in the presence of her attorney, and found her consent to be knowingly and voluntarily entered with a full understanding of the legal consequences.

The commissioner will file the appropriate amendment to reflect the respondent mother's consent as the sole ground for the termination of her parental rights.

The respondents and the children were represented by court-appointed counsel throughout the proceedings. The trial was held on three days, October 6 and November 25, 2003, and March 8, 2004. The court heard from seven witnesses, all called by the commissioner, including two court-appointed evaluators (a psychiatrist and a psychologist), two caseworkers with the department of children and families (department), a visitation supervisor, a family therapist and the foster mother. The court also heard from the attorney who served as the children's guardian ad litem, who was also appointed by the court. The court received twenty-three exhibits into evidence, all introduced by the commissioner. The court took judicial notice of the following five items: (1) a department caseworker's (Janis Courter) affidavit dated April 17, 1997; (2) a department caseworker's (Martin Vega, Jr.) affidavit dated April 15, 1997; (3) a department caseworker's (Calvin Williams) affidavit dated October 26, 1999; and (4) and (5) each respondent's specific steps dated March 17, 2000, pursuant to General Statutes § 46b-129 (j), designed to facilitate the return to them of their children.

This court, after reading the termination petitions and the summary of the adjudicatory facts accompanying

them, reviewing all exhibits, considering the testimony of each witness, assessing the credibility of each witness and considering the arguments of counsel, makes the following findings.

## I

## HISTORY OF PROCEEDINGS

### A

### As to Respondent Mother's Oldest Child

It is important to note that this court, after a three day trial, terminated the parental rights of G, who is the father of the respondent mother's oldest child, A, who was born on August 2, 1989, and is currently fourteen years of age. The commissioner did not seek the termination of the respondent mother's parental rights as to A, as to do so would not have been in the child's best interest. The approved permanency plan for A is independent living. The court's memorandum of decision relative to A was filed on December 12, 2003, and contains many historical facts that are applicable to the respondents and the two children in this case.

The respondent mother's youngest child, S, apparently continues to reside with her. Little was mentioned of that child during the trial, and little is found in the exhibits. S is approximately two and one-half years of age. This court has no evidence as to her paternity.

### B

### Previous Court Proceedings

At the commencement of the trial on October 6, 2003, the court recited the history of this case as reflected in the record of previous court proceedings. All counsel agreed with the accuracy of the court's recitation. A transcript of that history is in the court file. This court will briefly mention the significant events:

March 25, 1997: The commissioner filed a neglect-uncared for petition as to A and H.

April 17, 1997: The court issued an order of temporary custody as to both children.

December 12, 1997: L was added to the neglect petition; the commissioner did not seek an order of temporary custody for L.

January 16, 1998: A and H were committed to the custody of the commissioner.

May 27, 1998: Protective supervision was ordered for L.

July 13, 1999: A and H were returned to parental care under an order of protective supervision.

October 26, 1999: An order of temporary custody was issued as to all three children. Since then, none of the children has been returned to parental care.

March 17, 2000: All three children were committed to the custody of the commissioner. Their commitment remains in effect.

September 20, 2002: The termination petitions were filed by the commissioner.

C

Events Prior to Order of Temporary Custody dated April 17, 1997

On October 24, 1994, the department received a call from A's paternal uncle indicating that A, who was then five years of age, was "black as coal," that the respondent mother was using crack cocaine, that there was no food in the house and that the child was not receiving medical attention. The uncle also indicated that A had threatened to blow someone's head off with

the respondent father's gun. The referral was substantiated.

On November 27, 1995, school personnel reported that A, then age six, was missing a lot of school and that when she did attend, she was dirty. The home was reported to be in "deplorable condition." The teachers reported that A cried daily. A disclosed that she had nightmares that the respondent father would come and kidnap her, and that the respondent mother invited "many men" into her home. The referral was substantiated.

On December 6, 1995, school officials complained that A was coming to school with holes in her clothing and was sexually acting out. She appeared dirty and had a foul odor. Again, the referral was substantiated.

On February 26, 1996, school officials reported that A had many scratches and bruises that were inconsistent with the child's explanation as to how they occurred. The maternal grandmother reported that the respondent mother was manic depressive and was unable to care for the child. The referral was substantiated.

On June 20, 1996, school officials reported that A had been absent twenty-seven times and late seventeen times. A told school officials that at times, she was unable to wake up the respondent mother, who also was caring for four month old H. Again, the referral was substantiated.

On July 1, 1996, an anonymous caller complained to the department that both respondents were using crack cocaine, selling cocaine and selling prescription drugs. It was reported that there were no diapers for H and that the two children were filthy. It was also reported that A knew how to cook crack cocaine. Again, the referral was substantiated.

On December 30, 1996, another anonymous caller reported to the department that both parents were using crack cocaine, that the children were dirty, and that the baby was drinking water and not milk. Again, the referral was substantiated by the department.

The commissioner, on March 25, 1997, on the basis of that history and the substantiation of continuing neglect and drug use, filed a neglect petition alleging that both A and H were neglected and uncared for.

The order of temporary custody was issued only three weeks after the neglect petition was filed, as the respondent mother was then homeless and was moving, temporarily, from place to place with the two children. The respondent mother was continuing to abuse cocaine. The children were neglected and were constantly filthy, and the respondent mother was leaving the children with her mother, who was a person well known to the local police.

On April 14, 1997, the department received an anonymous report that the respondent father was picking up H by the neck and shirt, and throwing her against a wall onto a bed, and that the respondent mother was abusing cocaine, Valium and Percocet. The respondent mother and her children were living in one room in a home in which three other adults and a fourteen year old child resided. The department's investigator observed clothes strewn throughout the house and reported that the house was a complete mess. The respondent mother indicated that she planned to move in with another friend and that her stay at that home was only temporary. The respondent mother informed the investigator that the respondent father had left her several days before. The respondent mother was arrested on an outstanding warrant. The commissioner initiated a ninety-six hour hold, as H had no appropriate caretaker. A, who was with her maternal grandmother, was also

removed by the department, as she was not receiving proper care and attention.

Despite the many previous substantiated referrals to the department, neither the respondent mother nor the maternal grandmother were cooperating with the department or its service providers. It is noteworthy that the respondents continued to refuse all department services up to the birth of L on October 15, 1997.

Despite, however, the respondent mother's continued refusal to access services, the department did not seek an order of temporary custody for the infant, as the respondent mother and the child tested negative for drugs. The respondent mother had refused all drug treatment, housing assistance, prenatal care and case-worker services. It was reported that she stopped taking her antidepressant medications.

The circumstances surrounding L's birth, in the court's view, would have justified a ninety-six hour hold and an order of temporary custody on the basis of "predictive neglect"; however, the department chose not to pursue that course of action.

Our statutes clearly and explicitly recognize the state's authority to act, before harm occurs, to protect children whose health and welfare may be adversely affected and not just children whose welfare has been affected. The commissioner need not show, but need simply allege, that there is a potential for harm to occur. *In re Michael D.*, 58 Conn. App. 119, 124, 752 A.2d 1135, cert. denied, 254 Conn. 911, 759 A.2d 505 (2000).

## D

### Further Court Proceedings

On January 21, 1998, A and H were committed to the care and custody of the commissioner while L was permitted to stay with the respondent mother even

though a neglect petition had been filed relative to L on December 12, 1997. That petition was ordered consolidated with the pending petition on the other children.

On May 27, 1998, L was adjudicated neglected; however, she remained with the respondent mother under an order of protective supervision.

On January 15, 1999, the commitment was extended for A and H. The commitment, however, was revoked on July 13, 1999, and protective supervision was ordered for A and H until January 16, 2000. As to L, protective supervision was extended to January 16, 2000. Thus, as of July 13, 1999, all three of the respondent mother's children were in her custody.

E

From July 13, 1999, to Second Order of Temporary Custody dated October 26, 1999

On July 13, 1999, the court, *Ward, J.*, appointed a guardian ad litem for A, who was then ten years of age. School officials were again expressing concern as to the children's welfare and the respondent mother's erratic behavior that included failure to cooperate with Casey Family Preservation Services and threats of suicide.

A special education supervisor at the school attended by A and H wrote to the department on September 27, 1999, as she was "deeply concerned" as to the children's welfare. H was three years old. She had attended preschool on one day and was disenrolled by the respondent when school personnel contacted the department. The child did not return for the 1998-1999 school year. In September, 1999, H missed one week and then was brought to school by nine year old A. The children were bothered by head lice. They were unkempt, dirty and

lacking in proper hygiene. That prompted another referral to the department on September 21, 1999. Thereafter, despite meetings with department and school personnel, the respondent mother kept H out of school for days. When she returned, the child appeared to be ill. At dismissal at the end of the day, H stated to school personnel: "Me no go home; no mommy, no daddy." The special education supervisor was so alarmed by the child's statement that she wrote a letter to the assistant attorney general and the office of the state child advocate. By the time a response was received, the order of temporary custody had been issued.

On October 26, 1999, Judge Dranginis issued an order of temporary custody after the commissioner imposed a ninety-six hour hold relative to all three children. According to the caseworker's affidavit on that date, relative to which this court has taken judicial notice, many of the same problems that led to the first order of temporary custody were reoccurring.

The respondent mother was leaving her children for hours without telling the baby-sitter where she was going or when she would return. The respondent mother was not cooperating with school officials and the requirements necessary to enroll A in school. The house was in deplorable condition, and all three children were reported to be "filthy."

Domestic violence was occurring between the respondents with A in the middle. The respondent father was charged with disorderly conduct and risk of injury to a child, as the children were in potential danger. H sustained an unexplained black eye. The respondent mother was arrested after L, who was then two years of age, was found roaming the streets naked.

As noted, since the order of temporary custody issued on October 26, 1999, the children have not been returned to parental care. As of the commencement of

the trial, A, H and L had been in foster care for four years—well in excess of federal and state mandates as to the amount of time a child should spend in foster care.

On February 14, 2001 (three years ago), Judge Tanzer found that as to the respondent father, the department need not make any further efforts at reunification. On May 29, 2002, nearly two years ago, that finding, by clear and convincing evidence, was made as to the respondent mother. On February 5, 2003, Judge Santos made that finding, as to both respondents, by clear and convincing evidence.

## II

## FACTS

## A

### As to Respondent Mother

On January 16, 1998, at the time of A's and H's commitment to the custody of the commissioner, the court issued to the respondent mother the specific steps as provided in § 46b-129 (j). She was ordered to participate in individual and family counseling, and in parenting classes. She was ordered not to abuse substances and to maintain adequate housing and income. Similar orders were entered by the court as specific steps on March 17, 2000, at the time A and H (for a second time), and L were committed to the custody of the commissioner.

Medical records indicate that on March 16, 1999, the respondent mother was admitted to a detoxification unit, having a history of a generalized anxiety disorder, a panic disorder and opiate dependency. She became dependent on Percocet after oral surgery. She stayed in the detoxification unit for a period of four days. She was discharged from medical aftercare on June 22, 1999, due to many missed appointments. She was diagnosed on her discharge as suffering from bipolar disorder in

addition to a panic disorder. She was addicted to pain medication and was "totally disabled." She had not worked since 1990 and left school after the tenth grade. The department referred her to another aftercare program in early 2000. She was continuing to abuse prescription drugs. She admitted that she was taking Valium five times a day and Percocet every few days. She was accompanied by a department caseworker for the intake evaluation, as she had missed four previous appointments. It was recommended that the respondent mother participate in individual therapy and obtain a psychiatric evaluation.

From October, 2001, through July, 2002, the respondent mother participated in several programs offered through the Wheeler Clinic in New Britain, the most significant of which was an intensive reunification program, the purpose of which was to successfully reunite the children with her.

Any reunification was to take place after a significant amount of therapeutic visitations that commenced with supervised visitation and reached a point, as to L, of overnight visitation during the weekdays. The program coordinator at the Wheeler Clinic testified that he worked with the respondent mother, initially, two hours per week during her visits with the children. In addition, one hour each week was spent on parent education, and additional time was later added for individual instruction with the respondent mother. Weekly progress meetings were held with the department caseworker. Progress reached a point in the latter part of 2001, when unsupervised day visits began with L on the weekdays and with A on the weekends. The goal was to reunify L with the respondent mother, then H, once L's return to her home was solidified.

L's return, however, never took place, as the overnight and all unsupervised visits were terminated in

February, 2002. The respondent mother had spent the night at a friend's house with L without the approval of the department or Wheeler Clinic personnel. The program coordinator testified that this was one of several incidents of unauthorized contact, including the respondent mother spending the night with the respondent father and L, allegedly in the same bed. An altercation was also reported during which the respondent father pulled the respondent mother's hair in the presence of the child. The respondent mother was visiting a friend's house with A while the respondent father, whom A feared, was also present. The respondent mother was not progressing in her therapy and was not successful in obtaining appropriate housing.

Once the overnight and unsupervised visits were terminated, two hour supported weekly visits were reinstated. The Wheeler Clinic program coordinator testified that the respondent mother "needed to patch what was broken down." Once the supervised visitation recommenced, however, the respondent mother was not prepared for the visits and often did not arrive on time. She did not make sufficient progress to justify the reinstatement of unsupervised visits. The program coordinator explained that the services provided to her through the Wheeler Clinic program went "beyond the norm." She was involved in the program for one and one-half years; the program usually lasted from six to eight months. The department authorized the additional time and effort. The respondent mother received the extra hour of parenting support. Many additional home visits were included in the program, as were many additional meetings with other participating providers. The respondent mother was ultimately discharged from the program in July, 2002, due to her lack of progress, given the length of time and the extent of the commitment by the Wheeler Clinic and the department to the failed reunification. The program coordinator stated that the

respondent mother made some progress, but that it "was punctuated by frequent lapses in judgment." After unsupervised visits were terminated, she was inconsistent in attending her individual and group therapy and was, once again, abusing prescription drugs. In January, 2002, she was referred by the department to the University of Connecticut Medical Center for medical and psychiatric evaluation. She was forty-five minutes late for her intake appointment and, as a result, a full assessment could not be performed. The assessment was rescheduled, and she failed to follow through. The program coordinator concluded that reunification was "thoroughly explored," and stressed the need and the entitlement of the children to permanency and stability.

On October 28, 1999, the respondent mother was arrested and charged with risk of injury to a child as a result of the incident when L was found wandering the streets naked. The child was returned by police officers; the respondent mother was found to be sleeping. The incident occurred while the respondent mother was on probation for a conviction of sale of controlled substances. She apparently failed to appear to answer the risk of injury charge and was also arrested on a charge of failure to appear. On May 3, 2000, she was sentenced to five years, the execution of which was suspended. She received five years probation. As a condition of that probation, she was to participate in a program operated by the Wheeler Clinic known as the Lifeline program to which she was referred by her probation officer. The respondent mother was discharged from that program within one month as a result of her lack of attendance. Her probation officer suspected that she was abusing prescription drugs. She was incarcerated for the violation of probation. The incarceration commenced December 6, 2002, and ended March 19, 2003. The issues of lack of housing, the continuing abuse of prescription drugs, domestic violence and failure to

follow through on the department's referrals, all of which prompted the initial order of temporary custody in April, 1997, and the second order in October, 1999, continued to be present in her life. At the time that the termination petitions were filed in September, 2002, she was no closer to being able to parent the children than she was when the department first became involved.

## B

### As to Respondent Father

The specific steps issued to the respondent father in January, 1998, were the same as those issued to the respondent mother. Most significantly, the respondent father was to visit the children as often as the department permitted. Similar steps were also issued to him in March, 2000. He was ordered to participate in individual and family counseling and to attend parenting classes. He was ordered to keep appointments with the department caseworker and to inform the department as to his whereabouts. He was ordered to engage in no criminal activity and, again, to visit the children as often as the department permitted. On the form provided for the specific steps and signed by the respondent father on March 17, 2000, just above his signature is the following:

"As the above-named respondent, I hereby agree to cooperate with the above conditions approved and ordered by the court and recognize that non-compliance with these steps [will] result in modification of the existing order or disposition. I acknowledge that failure to achieve these specific steps will increase the chance that a petition may be filed to terminate my parental rights permanently so that my child may be placed in adoption. I understand that I should contact my lawyer and/or [department] worker if I need help in reaching any of these steps."

The respondent father also was referred to the Project Safe program in June, 2000. He admitted during the

intake to a history of cocaine, marijuana and heroin abuse. He completed an inpatient program in 1995. He is thirty-nine years old and has four children, two with the respondent mother, and two with another woman. He has an extensive criminal history and, shortly before the Project Safe intake, was arrested in connection with domestic violence against the respondent mother. The intake evaluator noted that he was annoyed with the questions and appeared to attend the evaluation while under the influence. His answers to questions relative to substance abuse were deemed to be "contradictory and inconsistent." The evaluator recommended that the respondent father participate in a substance abuse education program, which was to meet on Mondays from 4 p.m. to 5 p.m. for seven weeks. Shortly thereafter, the respondent father was discharged from the program, as he left against medical advice.

From January, 1982, to October 16, 2002, the respondent father had been convicted of numerous criminal offenses, including robbery in the first degree, theft of a firearm, reckless endangerment in the second degree, sale of illegal drugs, assault, harassment, failure to appear, burglary and criminal mischief. Probation records reflect that on March 27, 2001, he received a suspended sentence of five years, with three years probation on numerous charges. A specific condition of probation was that he have no contact with the respondent mother. That court order would have expired on March 27, 2004, and resulted from a conviction of assault in the third degree; the victim was the respondent mother. Probation records revealed that the respondent father was unemployable and possessed few skills. A therapist to whom the respondent father was referred by the office of adult probation in June, 2002, reported that he was "terribly irresponsible, based on his delusional and paranoid perception of his environment." On October 16, 2002, the respondent father

was arrested on a charge of larceny in the fourth degree and was incarcerated under a $95,000 bond to await disposition. He was sentenced in February, 2003. The nature of that sentence was not found in the exhibits, nor was it testified to. He apparently was incarcerated on the larceny conviction and the violation of his probation. The department social study, dated October, 2002, reports that on numerous occasions, the respondent father told the department caseworker that he "wanted nothing to do with [the department]." As of October 30, 2002, he had not seen his two children in more than one year, although on two occasions he attempted to visit them without department authorization. As of that date, the department had had no contact with him since July, 2001. He refused to cooperate with the department and with all of the service providers. He refused all referrals for counseling, substance abuse education and parenting classes. He has not provided his two daughters with cards or gifts or letters and does not inquire as to their welfare.

### III

### ADJUDICATION

For the purposes of adjudication, the court is limited to consideration of those events that preceded the filing of the termination petitions or the latest amendment, except when the judicial authority must consider subsequent events as part of its determination as to the existence of a particular ground that might be alleged for termination of parental rights. Practice Book § 35a-7. The commentary to that section allows the court to consider postadjudicatory evidence in adjudicating cases alleging the statutory grounds of failure to rehabilitate and no ongoing parent-child relationship. The adjudication date is, therefore, September 20, 2002. The disposition date is the date that the trial concluded and the decision was reserved, i.e., March 8, 2004.

Because the termination of parental rights results in a complete severance of the legal relationship between a child and his or her parent, terminating one's parental rights has been referred to as "a most serious and sensitive judicial action." (Internal quotation marks omitted.) *In re Barbara J.*, 215 Conn. 31, 44, 574 A.2d 203 (1990). Because termination involves the ultimate interference of the state in the familial unit and results in a final severance of the legal relationship between child and parent, courts must require strict adherence to statutory standards. See *In re Migdalia M.*, 6 Conn. App. 194, 203, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986).

A

Reasonable Efforts

Prior to the court's consideration of the statutory grounds alleged by the commissioner to provide the basis for the termination of the respondent father's parental rights and prior to consideration as to whether termination is in the best interests of both children, this court must consider the "reasonable efforts" required by § 17a-112 (j) (1). That subdivision provides that in order for the court to grant the termination petition, it must find, by clear and convincing evidence, that the department has made reasonable efforts to locate the respondents and to reunify the child with them. In lieu of that finding, the court may find, by clear and convincing evidence, that the respondents are unable or unwilling to benefit from reunification efforts.

General Statutes § 17a-112 (j) (1) also provides in relevant part: "[P]rovided such finding is not required if the court has determined at a hearing pursuant to subsection (b) of section 17a-110 . . . that such efforts are not appropriate . . . ." Section 17a-110 (b) refers to a determination by a court as to the appropriateness

of continuing efforts "[a]t a hearing held in accordance with subsection (k) of section § 46b-129 . . . ."

On February 14, 2001, the court, *Tanzer*, *J.*, after a hearing, found that continued efforts by the department to reunify H and L with the respondent father were no longer appropriate. That finding was made as to the respondent mother on May 29, 2002, by the court, *Tanzer*, *J.* That finding was also made by the court, *Santos*, *J.*, on February 5, 2003. The latter findings were made by clear and convincing evidence.

Clearly, per the statutory scheme, this court is not obligated to make that finding yet a third time. See *In re Gary B.*, 66 Conn. App. 286, 290–91, 784 A.2d 412 (2001).

The respondent father claims that the department failed to explain to him the purpose of the referrals to service providers, i.e., the purpose of the court-ordered specific steps. By his statements, however, to department personnel that he wanted nothing to do with the department and by his refusal to keep the department posted as to his whereabouts, coupled with his failure to maintain appropriate contact with his children, the respondent father has clearly and convincingly demonstrated the futility of any attempts by the department at the claimed explanation. "It is axiomatic that the law does not require a useless and futile act." *In re Antony B.*, 54 Conn. App. 463, 476, 735 A.2d 893 (1999). He also claims that the department did not do enough to make visitation with his two children available to him. During an evaluation performed by a court-appointed psychologist, Bruce Freedman, in May, 2002, the respondent mother informed the evaluator that the respondent father had shown up at the Wheeler Clinic visiting center at a time when she was visiting with the two children under the clinic's supervision. Staff allowed him to stay but informed him that he needed to arrange any future

visits with the department. According to the respondent mother, he "declined to do this" and informed the staff that he would make appropriate arrangements to visit the children once they were returned to her care. As previously noted, the children have never returned home.

The respondent father's recent attempts to obtain visitation with his two daughters pale in comparison to his utter failure to seek contact with them prior to the commencement of the proceedings at this session of the Superior Court. His daughters, however strained the relationship may be, have demonstrated no reluctance to see their father, although they barely know him. The court, therefore, at the close of the evidence, stated that if the foster parents were willing to allow contact with the respondent father and the same was recommended by the children's therapists, the court would not be opposed to such contact.

Consistent with previous court findings, the evidence clearly and convincingly demonstrates that the department has exerted reasonable efforts to attempt to reunify the respondent father with the children, and that he was clearly and convincingly unwilling to benefit from such efforts. The court has previously detailed the substantial efforts made by the department to reunify the respondent mother with her two daughters. There is clear and convincing evidence that such efforts, including the implementation of an intensive and extensive reunification plan, were, indeed, reasonable and that she was unable to benefit from them.

B

Ground A—Abandonment

Statutory abandonment is established when a parent "has failed to maintain a reasonable degree of interest,

concern or responsibility as to the welfare of the child
. . . ." General Statutes § 17a-112 (j) (3) (A).

The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance. *In re Angellica W.*, 49 Conn. App. 541, 551, 714 A.2d 1265 (1998).

The evidence is clear and convincing that the respondent father has abandoned his two daughters, as that term is defined in the statute and interpreted by the courts. He has not supported them financially or otherwise, he has not provided them with gifts or letters or greeting cards, he has not participated in any therapeutic programs aimed at correcting his many parental deficits, he has not inquired as to the well-being of his children and he has not seen them in nearly three years. He has not demonstrated any of the attributes previously listed. During his evaluation of the respondent mother and the children in January, 2002, Freedman noted from the history, as contained in the documents and in her historical account, that the respondent father had not been involved in his children's lives. Nearly one year later, the department's social study reported that he continued his self-imposed disconnection from his daughters' lives.

Williams, who was the department caseworker from February, 1999, through January, 2003, testified that for about one year, the respondent father visited the children approximately twice a month; however, after one year, the visits were "pretty much none." As noted, the court in February, 2001, due to the respondent father's lack of contact with his daughters and refusal

to comply with his specific steps, found that the department need no longer make any effort to reunify him with his daughters. This court has searched the file and has not found a motion by the respondent father requesting court-ordered visitation. His recent attempts, through the administrative process, to obtain visitation while the case was pending at this session are not impressive. This court, therefore, finds that the commissioner has proven by clear and convincing evidence that the respondent father has abandoned his two daughters, as that term is statutorily defined.

## C

### Ground B—Failure to Rehabilitate

#### 1

#### The First Prong

The best evidence of the respondent father's failure to rehabilitate, both from a practical and a statutory point of view, is the fact that after having his children removed from parental care, not once, but for H, twice, he refused to participate in the court-ordered services that had, as their purpose, the reunification of his family.

"Personal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [The statute] requires the trial court to analyze the [parents'] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable within a reasonable time. . . . Rehabilitate means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation." (Citation omitted; internal quotation marks omitted.) *In re Eden F.*, 250 Conn. 674, 706, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999).

There is no evidence that the respondent father ever performed a constructive parental role relative to the children. To terminate parental rights for the failure to achieve rehabilitation, both prongs of the test incorporated in § 17a-112 (j) (3) (B) (ii) must be met: (1) that the parent has failed to achieve rehabilitation; and (2) that there is no reason to believe that the parent could assume a responsible position in the life of the child within a reasonable time considering the age and needs of the child. *In re Danuael D.*, 51 Conn. App. 829, 843, 724 A.2d 546 (1999).

The statute mandates that the court consider some future date insofar as parental rehabilitation is concerned, as reasonably achievable, given the age and the particular needs of the children. A parent's personal rehabilitation is to be determined, in part, by the extent to which he or she has complied with the specific steps issued by the court, which provide a warning to the parent as to the possible consequences of the failure to comply. *In re Shyliesh H.*, 56 Conn. App. 167, 179, 743 A.2d 165 (1999).

The evidence is crystal clear that the respondent father, as of the adjudication date and as of the trial date, had failed to address in any manner his antisocial behavior or his parental deficiencies. He not only failed to comply with the court-ordered specific steps, but he failed to maintain any relationship with the department and his daughters.

Although a reasonable inference may be made that the respondent father failed to attend at least one, if not two, of the court-ordered evaluations conducted by Freedman, the respondent father did participate in the court-ordered psychiatric evaluation performed by Richard B. Sadler in April, 1998. Even then, however, Sadler noted that "for a significant period," the respondent father refused to meet with or to cooperate with

the department's caseworker. Sadler's review of the submitted documents provoked comment as to the respondent father's many arrests. The respondent father apparently allowed then eight year old A to ride on a thirteen foot python he owned. He was reported to be "harsh and abusive" to H. It was also noted that neither of the respondents nor the children attended the first court arranged appointment with Sadler in November, 1997. It was also reported that the respondent father refused to provide a hair sample to the department. Sadler observed, however, that the respondent father was a "straightforward historian," but was "remarkably unaware" of the difficulties that his two children had experienced and the nature of the department's legitimate concerns. The respondent father referred to the department's attempts to initiate the specific steps as "bologna." He claimed that he and the respondent mother did a fine job with the children.

Sadler concluded that "both [respondents] were significantly impaired in their abilities to provide the day-to-day nurturing and emotional and moral direction that is needed by their children." During his observation of H with the respondent father, Sadler noted that the respondent father was unable to establish a verbal interaction with the daughter, although playtime was focused and appropriate.

The respondent father saw no need for therapeutic services for him; however, Sadler recommended individual therapy and parenting education. Sadler noted during his evaluation that the respondent father showed "more positive interpersonal characteristics than did [the respondent mother]" and concluded that the respondent father "may simply be an impaired parent, although not necessarily a bad parent." During his testimony at trial, however, Sadler agreed with the commissioner that the respondent father's failure to cooperate

with the department and refusal to address his children's parenting needs and his own parenting deficits was a "major problem" as to his ability to provide appropriate care for his two daughters.

Freedman's evaluations contain some relevant revelations by the respondent mother that are applicable to this statutory ground. Freedman reported in his evaluations of the respondent mother, A and H, that the respondent father needed to be evaluated, as he recently had been arrested in connection with an assault on the respondent mother, who, in Freedman's opinion, could not provide appropriate care for her children without "substantial help from a partner." Freedman noted that the respondent father was unemployed and, according to the respondent mother's account, had "problems of his own." She disclosed domestic violence between her and the respondent father. Freedman concluded that "it would be impossible to endorse the children's return to [the respondent mother's] care in the future without evaluating [the respondent father]." During Freedman's evaluation of her and her three children in January, 2002, she told him that she and the respondent father had separated, as they had had a physical altercation while she was pregnant with her youngest child. She disclosed that she was upset with the respondent father, who was "doing nothing" to aid in the children's return home. She disclosed that he had grabbed her by the face, causing her to bleed profusely. She admitted that after he was incarcerated for ten days, she "took him back." He was subsequently convicted of, inter alia, the assault on her and was given an eight month sentence. Freedman observed that the respondent father was not involved in his children's lives and had demonstrated many behavioral problems, including assaults on the respondent mother.

As noted, the respondent father informed the department's caseworker that he would not cooperate with

the department. The evidence clearly shows that he has been true to his word. He refused all the services offered by the department and mandated by the court, including parent education and therapeutic counseling. He missed many appointments for substance abuse evaluation and testing. As noted, he disconnected himself from his children's lives. This court, therefore, finds that the commissioner has proven the first prong of the failure to rehabilitate statutory ground by clear and convincing evidence, i.e., that the respondent father has failed to rehabilitate himself.

## 2

### The Second Prong and the Ages and Needs of the Children

H is now eight years old. She was removed from parental care, for the first time, when she was fourteen months old and removed, for the second time, when she was three and one-half years old. She has been in foster care for four and one-half years. L is now six and one-half years old. She was removed from her parents' care when she was two years of age. She, too, has been in foster care for four and one-half years.

Those two children have been compelled to linger in foster care for a time period greatly in excess of federal and state mandates. They have been deprived of the security, certainty and stability of a permanent home while adults, who are supposed to be acting in their best interests, attempted, not once, but twice (in H's case) to reunify them with their parents, who were clearly unable or unwilling to benefit from those efforts. When it became clear (in May, 2002) that parental reunification would not happen, other nonrelative custodial sources were pursued, literally, up to the eve of trial and beyond.

Permanency for the children is long overdue. They need their "forever home" now. To continue the uncertainty of foster care while other options are explored, to continue to deny them the certainty and stability of a permanent placement and to ignore the top priority to which their needs must be assigned would not only be contrary to their best interests, but would approach the realm of the absurd.

In May, 1998, Sadler warned of the risk of "serious damage" to H if her "family arrangements remain unsettled for much longer." In May, 2002, Freedman opined that the children were in foster care "far too long." He added that their placement "far exceeded the maximum time recommended by experts in the field." He urged the adults involved to find a permanent and secure home, and concluded that no more time should be given to the parents to rehabilitate. That was nearly two years ago.

The respondent father has, throughout the pendency of this case, shown no inclination to do what he needed to do to serve as either a custodial source on his own or as a supportive second parent to the respondent mother as the children's custodian. He ignored the department, ignored the court and ignored his daughters. He has, clearly and convincingly, demonstrated by his attitude and conduct that there is no reason to believe that within a reasonable time, he could assume a responsible position in the lives of his daughters, given their respective ages and critical need for a permanent and stable home. This court, therefore, finds that the commissioner has proven the second prong by clear and convincing evidence.

D

No Ongoing Parent-Child Relationship

The commissioner also alleged, relative to which the evidence is quite obvious, i.e., that there is no ongoing

parent-child relationship as that is defined in § 17a-112 (j) (3) (D).

Pursuant to § 17a-112 (j) (3) (D), the commissioner alleged as a ground for the termination of the respondent father's parental rights that there is no ongoing parent-child relationship, which means the relationship that ordinarily develops as a result of a parent having met on a day-to-day basis the physical, emotional, moral and educational needs of the child, and that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child.

In assessing whether the commissioner has proven that statutory ground by clear and convincing evidence, "the trial court [must] undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." *In re Kezia M.*, 33 Conn. App. 12, 20, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

"In considering whether an ongoing parent-child relationship exists, the feelings of the child are of paramount importance. . . . The ultimate question is whether the child has no present memories or feelings for the natural parent. . . . Feelings for the natural parent connotes feelings of a positive nature only." (Citations omitted.) Id., 21.

In its consideration of that ground, the court may also give weight to whether a parent has visited his children or has shown any interest in their lives. *In re Alexander C.*, 67 Conn. App., 417, 421, 787 A.2d 608

(2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003). A parent's willingness to avail himself of the reunification services offered by the department, as mandated by the court, may also be considered. See *In re Lauren R.*, 49 Conn. App. 763, 775, 715 A.2d 822 (1998).

During his evaluation in 1998, Sadler observed that H, who was twenty-two months old, demonstrated "no particular attachment to either parent." He reported that the respondent father appeared to be totally unaware of the difficulties faced by his two children. He found that the respondent father was significantly impaired, and unable to provide his children with the moral and emotional direction that their development required. Sadler noted that the respondent father was unable to verbally interact with H. In his report in January, 2002, Freedman noted the respondent mother's anger over the respondent father's failure to take any steps to secure the children's return to parental care. Freedman concluded, from his analysis of the data and interview with the respondent mother, that the respondent father was "not involved" in his children's lives.

As noted, the respondent father has not visited the children in three years, aside from two instances of unauthorized contact, has not provided them with gifts or greeting cards and has not inquired as to their welfare. The respondent mother told Freedman that the respondent father had stated that he would not visit the children unless and until they were returned to parental care. As also noted, the respondent father refused to cooperate with the department and refused to follow through with any of the court-ordered steps. He has not supported his daughters financially or otherwise and has not supported the respondent mother's failed attempts at reunification. In fact, he undermined her progress by his violent and aggressive behavior toward her.

L witnessed the bloody altercation that ultimately resulted in the respondent father's imprisonment. According to the current foster mother and the department caseworker, L becomes anxious and afraid when she sees a police car or hears a siren. L was traumatized by the respondent father's assault on the respondent mother. According to the caseworker, Williams, H does not mention the respondent father; her connection with him is "nonexistent." According to Williams, the children have "no bond" with the respondent father. That is certainly not surprising, given the fact that he has completely severed his relationship with his children and has chosen to do so. That is confirmed by his words and conduct. When asked by the current foster mother if the children ever speak of the respondent father, the foster mother paused, then answered, "They do not relate positive memories" of him. Given his lack of a parent-child relationship with his daughters, which is clearly and convincingly established by the evidence, the only contact that he should have with them is contact that the children's therapist and permanent parents deem to be in the children's best interests. Given the respondent father's history of ignoring his daughters and their every need, it is highly unlikely that he could ever serve as a parental resource for either of them. This court, therefore, finds that the commissioner has proven by clear and convincing evidence that there is no ongoing parent-child relationship between the respondent father and his two daughters, as defined in the statute and interpreted by the courts.

IV

DISPOSITION

Now that the court has found in the adjudication stage that the commissioner has proven each of the

statutory grounds alleged by clear and convincing evidence, this court must now consider whether termination of the respondents' parental rights is in the best interests of H and L.

The burden remains with the commissioner, who must convince the court that termination is, in fact, in the children's best interests. In making its determination as to best interests, the court may take into account not only events preceding the filing of the present petitions, but may consider all events up to the conclusion of the trial. See Practice Book § 35a-9.

Each case must be decided on its particular facts and circumstances, as it has been held that the determination of whether to terminate parental rights is a highly fact specific process. *In re Shane P.,* 58 Conn. App. 244, 254, 754 A.2d 169 (2000).

The trial court is vested with broad discretion in determining what is in the child's best interests. *Schult v. Schult,* 241 Conn. 767, 777, 699 A.2d 134 (1997). "Conducting a best interest analysis is not a narrow concept restricted to a compelling reason [for keeping a parent in a child's life] or to fully reuniting the parent with the child. Rather, it is purposefully broad to enable the trial court to exercise its discretion based on a host of considerations." (Internal quotation marks omitted.) *In re Alissa N.,* 56 Conn. App. 203, 208, 742 A.2d 415 (1999), cert. denied, 252 Conn. 932, 746 A.2d 791 (2000).

The best interest of a child includes the child's interest in sustained growth, development, well-being and continuity, and stability of its environment. *In re Shyina B.,* 58 Conn. App. 159, 167, 752 A.2d 1139 (2000).

"It is indisputable that protecting the physical and psychological well-being of children is a compelling, as well as legitimate, state interest." (Internal quotation

marks omitted.) *In re Shane P.*, supra, 58 Conn. App. 260.

"The primary concern of [the department] is the safety of [the child]. . . . Where appropriate, the agency can and must take unilateral action either to reunite families or to terminate parental rights as expeditiously as possible to free neglected children for placement and adoption in stable family settings." (Internal quotation marks omitted.) Id., 258.

"The parent has only one interest, that of family integrity . . . and the state has only one compelling interest, that of protecting minor children. . . . The child, however, has two distinct and often contradictory interests. The first is a basic interest in safety; the second is the important interest, discussed above, in having a *stable family environment*." (Citations omitted; emphasis added.) *In re Juvenile Appeal (83-CD)*, 189 Conn. 276, 287, 455 A.2d 1313 (1983).

Once the commissioner has proven a statutory ground by clear and convincing evidence, it is proper for the court, in assessing the child's best interest, to consider the circumstances of the proposed adoptive parents and the suitability of the permanent placement of the child with them. *In re Vincent D.*, 65 Conn. App. 658, 666, 783 A.2d 534 (2001).

## A

### As to the Children

H is now eight and has been in foster care for more than half her life. When evaluated by Sadler, she was twenty-seven months of age. Sadler noted that the child barely made a verbal response to words and that her gait was similar to that of the one year old. Sadler found that she was developmentally delayed in her gross and fine motor skills, and that her interpersonal interactions

were impaired. The child was unable to differentiate her caretakers from strangers. Sadler strongly recommended that H participate in the Birth To Three Program, in which she subsequently participated.[1] H was evaluated by Freedman in January, 2002. She was then nearly six years of age. Freedman reported that she exhibited "very limited" expressive language for her age, in the manner of a significantly younger child. Her verbal skills were far below average, and her language and memory skills were significantly delayed. Freedman strongly recommended a special education program. Due to her special needs as a result of her developmental delays, H did repeat kindergarten. When Freedman next saw the child four months later, he noted that as of that time, H had been in foster care for two-thirds of her life, during which she had experienced two different placements. As noted, Freedman opined that the child had been in foster care "far too long." Freedman testified that any additional placement should occur for "extreme and well thought out reasons" only, noting that disruptions in placements can "shatter a child's ability to establish relationships throughout her life." Freedman testified that the maximum placement of a child in foster care should be one to one and one-half years, and that H's placement, and that of her sister, was "well beyond the laws that try to prevent this."

L is now six and one-half and has been in foster care for in excess of two-thirds of her life. Unlike her sister, she has experienced no developmental delays and is a very verbal child. The department caseworker reports that she is a happy child, is very talkative and often smiles. There is some concern, as she periodically wets her bed.

---

[1] That program was established within the department of mental retardation to assist developmentally delayed children and their parents. See General Statutes § 17a-248 et seq.

H and L have been in the same preadoptive home since September 6, 2003. They are the only children residing with the current foster parents, who are committed to the adoption of both girls. First contact was made in July, 2003. Gradually, visiting sessions were increased from supervised to day visits to overnight visits prior to the placement. The placement is therapeutically supervised by a clinical caseworker from the Boys and Girls Village in Milford, who testified that she has made ten to twelve visits at the home and that the placement is going well.

The foster mother testified that at first, H was often angry, but that there have been "positive changes," as H now knows, appreciates and understands that the foster mother and foster father want to be, as H puts it, a "forever family" with her and her sister. The children refer to the foster parents as "mama and poppa." The children have friends at school and in the neighborhood, and have "lots of cousins." They are part of a very stable and structured family life. H is now in the first grade and receives special education for speech and reading. The foster mother receives, at her request, daily progress notes from H's teacher, all of which have been good. L is in kindergarten and receives some help for speech related issues. Both foster parents work, but their hours and job requirements allow maximum time to be with the children. When work requirements impact on the school day, the foster mother's mother is available and watches the children until the arrival of the foster father.

The clinical social worker supporting the placement testified that the foster parents are open to her instruction and that the children are doing well, both in the home and at school. The children are affectionate with the foster parents and call them mom and dad. H has stated to the social worker that she "hopes to be adopted soon." In the social worker's opinion, on the

basis of her observations, both children have bonded with their preadoptive parents; it would be detrimental to move them from that placement.

A department caseworker in this matter since February 10, 2003, who has been working to support the current placement, testified that the two children are comfortable living with each other and their caretakers; in fact, although a bedroom is available to each child, they opted to share a room. The children are "well adjusted." The foster parents are anxious to adopt.

Attorney Susanne D. McNamara, the court-appointed guardian ad litem for the children, stated that H is "very vocal" as to her desire to be adopted by her current caretakers. She stressed the strong commitment that the children's current foster parents have made to them and stated that they are very proactive in accessing supportive services for the children. According to their guardian ad litem, the children have made "enormous strides" since their placement with their preadoptive parents.

## B

### As to Respondent Mother

The respondent mother was first evaluated by Freedman in June, 1997. She was twenty-nine years of age, had two children (A and H) and was pregnant with L. She was taking daily doses of Valium and described herself as psychiatrically disabled. She was receiving and currently is receiving social security disability benefits. She admitted to the domestic violence between her and the respondent father.

Freedman was concerned that she was incapable of managing the care of a school-age child, a toddler and an infant. Freedman concluded: "[The respondent mother] was a woman who had been the subject of many referrals regarding poor care of her children, both from

anonymous family sources as well as school staff. She had reacted with hostility and evasion to [department] attempts to investigate her care of her children. [She] reported that she had an established psychiatric disability, for which she received a monthly payment, and took a potent, potentially addictive tranquilizer. [She] showed signs of poor judgment. This included her choice of male companions, in the disorganization of her life, in her inability to maintain housing and manage her finances, and in her ability to care for her children, get them to school regularly, and maintain adequate cleanliness of her house and children. [She] insisted she did not use drugs, but had shown a positive test for cocaine, and different observers had reported signs of drug abuse."

Sadler evaluated the respondent mother nearly one year after Freedman. He referred to her as an "unreliable historian," who accepted no responsibility for her children's problems and who was participating in services to get the department out of her life. Sadler observed that she was "emotionally distant" from H. Sadler concluded that the respondent mother was "clearly impaired as a parent" and expressed "grave concerns" as to her parenting deficits. Sadler recommended that the respondents be given just three months to rehabilitate and, if unsuccessful in doing so, that the children be permanently placed for adoption.

Freedman, again, evaluated the respondent mother in January, 2002, and concluded, from the history given, that little had improved. Since his last evaluation, the children (A and H) had been returned, only to be removed, along with L, once again. The respondent mother had lost her apartment, had had a violent altercation with the respondent father and took up with another violent male partner. She continued to abuse prescription drugs. Four months later, during his third evaluation of the respondent mother, Freedman noted

that she had "a striking amount of additional problems, stress and changes in her life." She claimed that she was doing well, but her clinicians did not agree. As noted, they did not see her as being capable of providing appropriate care for her daughters. Freedman testified that she was no more able to provide parental care for her children in May, 2002, than she was five years earlier. She was "unable to focus on her children and was overwhelmed by her own crises." Freedman testified, on the basis of his observations of the interaction of the respondent mother with H and L, that he did not see a "deep attachment"; the relationship was more akin to "familiarity and closeness." Freedman opined that any future attempts at reunification are not in the children's best interests and that permanency for them is long overdue.

"The psychological testimony from professionals is rightly accorded great weight in termination proceedings." *In re Nicolina T.*, 9 Conn. App. 598, 605, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987). The current caseworker testified that both children enjoy their monthly visits with the respondent mother, but neither wants to live with her. The preadoptive parents are currently willing to allow some contact after the conclusion of these proceedings, although the respondent mother was made fully aware by this court, during the consent canvass, that they are not obligated to do so.

On the basis of the foregoing, this court finds that the commissioner has proven by clear and convincing evidence that termination of the parental rights of the respondent mother is in the best interests of both of her daughters.

## C

### As to Respondent Father

In considering the best interests of the children when it comes to the respondent father, the question pre-

sented is as follows: is it in their best interests to terminate the parental rights of a parent of two children who barely know him, a parent who has not supported them, a parent who does not communicate with them, a parent who does not ask about them and a parent who has chosen not to see them? The answer is obvious. The evidence is overwhelming, and well beyond the clear and convincing standard, that the respondent father not only abandoned his two daughters in the statutory sense, but abandoned them in a real sense. He has performed in a manner that is the very antithesis of the definition of "parent." It is clearly and convincingly in the best interests of H and L that the respondent father's parental rights be terminated so that those two children will achieve the permanency and stability that he was unable and unwilling to provide.

V

STATUTORY FACTORS

In a nonconsensual termination, the court, in deciding whether termination of a parent's rights is in a child's best interest, is mandated to consider those factors provided in § 17a-112 (k), which serve as guidelines to assist the court. Proof of each factor by clear and convincing evidence is not required. *In re Quanitra M.*, 60 Conn. App. 96, 104, 758 A.2d 863, cert. denied, 255 Conn. 903, 762 A.2d 909 (2000). The court, therefore, in deciding to terminate the respondent father's parental rights, has considered the following:

1. The timeliness, nature and extent of services offered.

As noted, the court found in February, 2001, and again in February, 2003, that the department need not make any further efforts to reunify the respondent father with his daughters. As also noted, the respondent

father, on several occasions, informed department personnel that he wanted nothing to do with the department. Early on in this case, the department referred the respondent father to a therapeutic program, a program that he left against advice. The respondent father has failed to cooperate with the department's efforts at reunification and has failed to comply with the court-ordered steps, a purpose of which was to improve his parenting ability. The department is not obligated to engage in exercises of futility and is obligated to act in the best interests of these two children, which, after inordinate delay, it has finally done.

2. Reasonable efforts to reunite.

The court has previously referred to the efforts that the department made in order to reunite the respondent father with his daughters, efforts that he rebuffed. The evidence clearly shows that it was his decision not to visit with his children; he therefore bears the sole responsibility for his disconnection from their lives.

3. Fulfillment of court-ordered obligations.

The respondent father refused to follow the court-ordered steps that he needed to follow in order to be in an appropriate position to discharge his parenting responsibilities. His refusal to cooperate with the department in the implementation of the court-ordered steps clearly evidences his intention to remove himself from his daughters' lives.

4. The feelings and emotional ties between the children and the respondent father, and between the children and their preadoptive parents.

The children barely know the respondent father. Except for two inappropriate contacts, he has not communicated with his daughters and has not seen his daughters in three years. He has not made any inquiry as to their health, welfare and development. As testified

to by the current foster mother, the children's memories of him are not of a positive nature.

Since placement with their preadoptive parents, the children have achieved a familial bond with them; they are comfortable with each other, and they are comfortable with their caretakers. They refer to their preadoptive parents as their mom and dad. They have adjusted well in their new environment and are performing well in school. Their preadoptive parents are committed to making them a permanent part of their lives.

5. The ages of the children.

H is eight and L is six and one-half. Both children have been in foster care since October, 1999, a period of four and one-half years. For H, that is more than half of her life; for L, it is two-thirds of her life. The permanency and stability that the adoption of these children by their current foster parents will accomplish is, to grossly understate the matter, long overdue.

6. The respondent father's efforts to adjust his circumstances, conduct and condition.

The respondent father has made no effort to adjust the circumstances and conditions that resulted in the removal of his daughters from parental care, in H's case, on two separate occasions. He has made no effort to adjust his oppositional, antisocial and criminal lifestyle, and has refused all services that would have made it possible for him to have a parental relationship with his children. He has failed to visit his children or to keep in contact with them.

7. The extent to which the respondent father has been prevented from maintaining a meaningful relationship with his daughters by the unreasonable acts of the respondent mother or of any other person or by his economic circumstances.

Neither the unreasonable acts or conduct of the respondent mother, nor the unreasonable acts of any other person or economic circumstances have prevented the respondent father from maintaining a relationship with his two daughters. He has no one to blame but himself for the permanent loss of his parental rights.

## VI

## ORDERS

On the basis of the foregoing, it is ordered that the parental rights of the respondent father, because of his abandonment, his failure to rehabilitate and due to the lack of any ongoing parent-child relationship, all within the meaning of § 17a-112 (j) (3), be and are hereby terminated with respect to his minor children, H and L.

It is ordered that the parental rights of the respondent mother, by virtue of her consent, be and are hereby terminated with respect to her minor children, H and L.

It is ordered that the commissioner is hereby appointed statutory parent for each child and shall submit to the Superior Court for Juvenile Matters in New Britain, within thirty days of this judgment, a case plan and, thereafter, such further reports as may be required by law until the permanency plan is finalized, with first consideration to the adoption of both children by their current caretakers.