# IN RE EMERALD C.*
## (AC 28573)

Bishop, McLachlan and Gruendel, Js.

---

\* In accordance with the spirit and intent of General Statutes § 46b-142 (b) and Practice Book § 79-3, the names of the parties involved in this appeal are not disclosed. The records and papers of this case shall be open for inspection only to persons having a proper interest therein and upon order of the Appellate Court.

Argued March 24—officially released July 1, 2008

*Marcia McCormack,* for the appellant (respondent father).

*Philip Miller,* assistant attorney general, with whom, on the brief, were *Richard Blumenthal,* attorney general, and *Susan Quinn Cobb,* assistant attorney general, for the appellee (petitioner).

*Trudy Condio,* for the minor child.

*Opinion*

GRUENDEL, J. The respondent father appeals from the judgment of the trial court terminating his parental rights with respect to E, his minor child.[1] He claims that

---

[1] The court also terminated the parental rights of E's mother, whom we refer to by that designation. Because she has not appealed, we refer in this opinion to the respondent father as the respondent.

We also note that pursuant to Practice Book § 67-13, the attorney for the minor child filed a statement adopting the brief of the petitioner in this appeal.

the court (1) improperly considered his noncompliance with requirements mandated by the department of children and families (department), (2) improperly found that the department made reasonable efforts to reunify him with E and (3) improperly found that he had failed to achieve a sufficient degree of personal rehabilitation pursuant to General Statutes § 17a-112 (j) (3). We affirm the judgment of the trial court.

E was born on June 14, 2003. Weighing a mere three pounds, she spent her first month clinging to life at Saint Francis Hospital and Medical Center in Hartford due to her mother's admitted substance abuse while E was in utero. E's mother had a history of involvement with the department regarding substance abuse, prostitution, physical neglect, medical neglect and risk of injury concerning her four older children. She also had a history of depression and suicidal ideation for which she required hospitalization. As a result, an order of temporary custody and a petition alleging that E was neglected and uncared for was filed on her behalf when she was born. On March 25, 2004, E was adjudicated neglected and was committed to the care and custody of the petitioner, the commissioner of children and families. The order of temporary custody was sustained shortly thereafter.

For the first ten months of her life, the identity of E's father was unknown. On April 29, 2004, a paternity test confirmed that the respondent was E's father.

The respondent was born in the African nation of Ghana. In 2000, he relocated to the United States. At that time, the respondent had two daughters in Ghana, aged two and four. As the court found, "[w]hen he left Ghana, [the respondent] abandoned his daughters . . . and has not seen them since." The respondent met E's mother in the summer of 2002. The respondent maintained that their relationship never was serious,

describing it as "nothing more than a sexual relationship on a few occasions that led to the conception of [E]."

In an effort to gain custody of E, the respondent on August 19, 2004, voluntarily agreed to comply with thirteen specific steps issued by the court. That court order required the respondent (1) to keep all appointments set by or with the department and to cooperate with department home visits, announced or unannounced, and visits by E's court-appointed attorney or guardian ad litem; (2) to keep E's whereabouts and his own whereabouts known to the department, his attorney and the attorney for E; (3) to participate in counseling and to make progress toward the "identified treatment goals" regarding his parenting skills; (4) to submit to substance abuse assessment and to follow recommendations regarding treatment; (5) to submit to random drug testing, the time and method of which shall be at the department's discretion; (6) to engage recommended service providers for parenting, individual and family counseling, in-home support services or substance abuse treatment; (7) to sign releases authorizing the department to communicate with service providers to monitor attendance, cooperation and progress toward identified goals, and for use in future proceedings before the court; (8) to secure or maintain adequate housing and legal income; (9) to have no substance abuse; (10) to have no involvement with the criminal justice system; (11) immediately to advise the department of any changes in the composition of the household so as to ensure that the change does not compromise the health and safety of E; (12) to maintain E within the state of Connecticut for the duration of this case except for temporary travel out of state with the authorization of the department or the court in advance; and (13) to visit E as often as the department permits.

In its memorandum of decision, the court chronicled the various efforts made by the department to reunify the respondent with E: "From April 29, 2004, to April 22, 2005, the following service providers were contacted on the [respondent's] behalf: Family Development Center, Community Child Guidance Center, New Hope and Planned Parenthood. [The respondent] was either unable or unwilling to adjust his work schedule to accommodate an intake for any of these services; therefore, these services could not be put in place. [The respondent] began having supervised visits with [E] at [the department] in July, 2004. From July 2, 2004, to April 8, 2005, these visits continued even though they were reported as being detrimental to the well-being of [the] child. On December 8, 2004, [the mother] was seen in [the respondent's] apartment. On December 17, 2004, [the respondent] was instructed by [the department] that he was not to have contact with [the mother] and [that] if he were to continue to maintain contact, it would jeopardize reunification efforts with [the] child. On April 29, 2005, [the respondent] was asked if he had any contact with [the mother], but he denied such contact. He was aware that any contact with [the mother] would jeopardize his reunification with [the] child.

"From April 22, 2005, to February 8, 2006, [the respondent and E] engaged in reunification and parenting programs with Abundant Families and [the Parent Infant Program]. Abundant Families characterized [E] as being 'hysterical' but reported that the interaction was appropriate. The Parent Infant Program reported visits between [E and the respondent] as being appropriate. These reports appear to be contradictory. On February 8, 2006, [E] was reunified with [the respondent]. On March 14, 2006, [the respondent and the mother] were involved in domestic violence, and [the respondent] was arrested for disorderly conduct and unlawful

restraint.[2] On March 15, 2006, [E] was removed from the care of [the respondent]. From April 19 to May 25, 2006, [the respondent] submitted to one urine screen out of eight.

"After [E] was removed from [the respondent's] care on March 15, 2006, she and [the respondent] engaged in four supervised visits in the community. Two social workers and [E's] attorney were present for three out of the four visits. These visits were observed as being extremely detrimental to the well-being of [the] child. On June 8, 2006, the Juvenile Court in Hartford ceased visitation between [the] child and [the respondent] because the child was having significant adverse reaction to the visits. On June 9, 2006, it was reported to [the department by R, one of the mother's older children], that [the respondent and the mother] were living together and planning on getting married at the time of [the respondent's] reunification with [E]. [The respondent] was fully aware that any contact with [the mother] would jeopardize reunification efforts with [E] and yet he chose to withhold this information from [the department]."

On June 23, 2006, the petitioner filed a petition for termination of parental rights as to both the respondent and the mother. The ground for the petition was the failure to achieve sufficient rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii).[3] The court held a trial on

[2] As the court recounted: "[O]n March 15, 2006, [E] was removed from [the respondent's] care due to a traumatic domestic violence situation between [the respondent and the mother at the respondent's] apartment on March 14, 2006. According to the Manchester police department report, [E] was present as [the respondent] drank a pint of gin and several beers, then engaged [the mother] in a physical altercation. This altercation included [the respondent's] punching, pushing and screaming at [the mother and the mother's] stabbing [the respondent], all with [E] present."

[3] General Statutes § 17a-112 (j) provides in relevant part: "The Superior Court . . . may grant a petition [to terminate parental rights] if it finds by clear and convincing evidence that . . . the child . . . has been found by the Superior Court . . . to have been neglected . . . in a prior proceeding . . . and the parent of such child has been provided specific steps to take

November 13 and 17, 2006.[4] At trial, the petitioner submitted five exhibits and six witnesses, and eight exhibits were submitted on behalf of E. The respondent submitted two exhibits and testified on his own behalf.

In its January 31, 2007 memorandum of decision, the court found that the department had made reasonable efforts to reunify the petitioner and E, and that the respondent had failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B). It further found that termination of the respondent's parental rights was in the best interest of E.[5] Accordingly, the court granted the petition and this appeal followed.

I

Although not a model of precision, the respondent's first claim appears to be that because he "completed all of the steps required," the court improperly considered his noncompliance with additional requirements mandated by the department. For two reasons, that claim is flawed.

First, the court never found that the respondent fully complied with the court-ordered specific steps. Rather, it made multiple findings to the contrary.[6] For example, the court found that although he was required to submit to random drug testing conducted at the discretion of

to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ."

[4] The mother was not present at trial and a default entered for failure to appear.

[5] Only the adjudicative phase of the proceeding is at issue in this appeal.

[6] In evaluating the reunification efforts made by the department, the court noted the respondent's "proven inability to fully comply with court-ordered specific steps . . . ."

the department, the respondent failed to submit to several urine tests.[7] The court found that although the petitioner was required to participate in counseling and to make progress toward the identified treatment goal of improving his parenting skills, "he was either unable or unwilling to adjust his work schedule to accommodate an intake" for multiple services initiated by the department, including those offered by the Family Development Center, Community Child Guidance Center, and New Hope and Planned Parenthood.[8] The court found that although he was required to visit E "as often as the department permits," the respondent did not comply. Instead, "[w]hen visits were increased from one hour to two hours on December 21, 2004, [he] cancelled the first two visits, and, thereafter, he did not adhere to the increased hours. He either arrived one hour late or left one hour early." The respondent also cancelled scheduled visits with E on May 11 and June 1, 2006. Although he was required to secure and to maintain adequate housing, the respondent refused to provide the department with a copy of his apartment lease to verify occupancy and refused to provide his landlord's telephone number to verify rent information. The respondent additionally was required to have no involvement with the criminal justice system. Nevertheless, on March 14, 2006, he was arrested on charges of disorderly conduct and unlawful restraint stemming from the domestic violence dispute with the mother in which "[a]fter a night of drinking and domestic violence, [the respondent] was stabbed by the mother in the

---

[7] The department's social study for termination of parental rights that was offered into evidence at trial indicated that the respondent failed to submit to urine tests on April 19 and 24, and May 2, 9, 15 and 23, 2006, all of which were scheduled after the March 14, 2006 domestic violence dispute.

[8] Although the respondent initially participated in certain parenting services, once he reunified with E, "he was not compliant" and failed to keep his scheduled appointments with the reunification worker at Abundant Families. As a result, Abundant Families closed the respondent's file.

presence of [E]." See footnote 2. In light of the forego-
ing, the respondent's claim that he complied fully with
all of the required steps is untenable.

Furthermore, to the extent that the petitioner con-
tends that the court could not properly consider his
noncompliance with additional requirements mandated
by the department, his argument is contrary to Connect-
icut law. As this court observed in *In re Vincent D.*, 65
Conn. App. 658, 783 A.2d 534 (2001), "[i]n determining
whether a parent has achieved sufficient personal reha-
bilitation, a court may consider whether the parent has
corrected the factors that led to the initial commitment,
*regardless of whether those factors were included in
specific expectations ordered by the court or imposed
by the department.*" (Emphasis added.) Id., 670. In that
case, the respondent mother "had received explicit
advice from the department, which she understood,
that regaining custody of her child depended on her
living apart from [the child's] father until he was drug
free." Id. On appeal, this court held that the trial court
properly considered the respondent mother's noncom-
pliance with that requirement in finding that she had
not achieved a sufficient degree of personal rehabilita-
tion. Id.

It is undisputed that the department repeatedly
instructed the respondent that he was not to have any
contact with the mother. The department further
instructed the respondent not to allow E to have any
contact with the mother. At trial, the respondent testi-
fied that he was aware of those restrictions and the fact
that his failure to comply therewith could jeopardize his
reunification with E. The court was free to consider
the evidence of his noncompliance with those require-
ments in evaluating his rehabilitation. His claim, there-
fore, is without merit.

## II

The respondent next claims that the court improperly found that the department made reasonable efforts to reunify him with E. We conclude that there was adequate evidence in the record to support the court's determination.

"In order to terminate parental rights under § 17a-112 (j), the department is required to prove, by clear and convincing evidence, that it has made reasonable efforts . . . to reunify the child with the parent, unless the court finds . . . that the parent is unable or unwilling to benefit from reunification. . . . [Section 17a-112] imposes on the department the duty, inter alia, to make reasonable efforts to reunite the child or children with the parents. The word reasonable is the linchpin on which the department's efforts in a particular set of circumstances are to be adjudged, using the clear and convincing standard of proof. Neither the word reasonable nor the word efforts is, however, defined by our legislature or by the federal act from which the requirement was drawn. . . . [R]easonable efforts means doing everything reasonable, not everything possible. . . . The trial court's determination of this issue will not be overturned on appeal unless, in light of all of the evidence in the record, it is clearly erroneous." (Citation omitted; internal quotation marks omitted.) *In re Samantha C.*, 268 Conn. 614, 632, 847 A.2d 883 (2004). "A finding is clearly erroneous when either there is no evidence in the record to support it, or the reviewing court is left with the definite and firm conviction that a mistake has been made. . . . On appeal, our function is to determine whether the trial court's conclusion was factually supported and legally correct. . . . In doing so . . . [g]reat weight is given to the judgment of the trial court because of [the court's] opportunity to observe the parties and the evidence. . . . We do not examine the record to determine

whether the trier of fact could have reached a conclusion other than the one reached. . . . [Rather] every reasonable presumption is made in favor of the trial court's ruling." (Citations omitted; internal quotation marks omitted.) Id., 627–28.

In its memorandum of decision, the court found that the department made reasonable efforts to reunify the respondent with E. The court detailed various efforts, including procuring services from the following providers: "Family Development Center, Community Child Guidance Center, New Hope and Planned Parenthood, the Vernon Family Center, Abundant Families, Preschool Intervention Program, psychological and interactional evaluations, ADRC and Genesis." That finding is supported by the department's social study for termination of parental rights that was offered into evidence at trial.

In addition, the court had before it evidence that the department arranged supervised visits between the respondent and E that began in July, 2004, and continued for more than one year. When those visits proved unproductive, the department implemented additional services that provided even more time for the respondent to interact with E. The department also scheduled unsupervised overnight visits at the respondent's home. Furthermore, on February 8, 2006, while maintaining custody of E, the department reunited her with the respondent. The department arranged for day care on behalf of the respondent and agreed to pay half of that expense. The department also contacted Abundant Families, which provided the respondent with furniture for his apartment.

When the petitioner removed E from the respondent's care one and one-half months later in the wake of the domestic violence dispute, the department continued

its attempt at reunification by arranging multiple supervised visits with E. The department did so despite consistent reports that the visits were detrimental to E's well-being and that no meaningful bond between E and the respondent existed. As the attorney for the minor child emphasized in her statement filed pursuant to Practice Book § 67-13, "[t]he department worked with [the respondent] for nineteen months, well beyond the suggested time frame spelled out in the Adoption and Safe Families Act, 42 U.S.C. § 620 et seq. . . ."

The respondent faults the department for failing to offer him "any services regarding his position as the victim in a domestic violence situation." The record indicates, however, that the respondent was a perpetrator of domestic violence. The court specifically found that on March 14, 2006, the respondent "drank a pint of gin and several beers, then engaged [the mother] in a physical altercation. This altercation included [the respondent's] punching, pushing and screaming at [the mother and the mother's] stabbing [the respondent], all with [E] present." That finding is supported by the report filed by the Manchester police department following his arrest and introduced into evidence. By his actions, the respondent violated the department's instructions that he was not to have any contact with the mother and that he was to prohibit any contact between E and the mother. Notwithstanding that conduct, the department thereafter *continued* its efforts to reunify the respondent and E.

As we earlier noted, "[r]easonable efforts means doing everything reasonable, not everything possible." (Internal quotation marks omitted.) *In re Samantha C.*, supra, 268 Conn. 632. Examining the department's efforts in light of the particular circumstances of the present case, we conclude that there was adequate evidence from which the court could have concluded that the department made reasonable efforts to reunify the respondent with E. That determination is not clearly erroneous.

## III

The respondent contends that the court improperly found that he failed to achieve a sufficient degree of personal rehabilitation pursuant to § 17a-112 (j) (3) (B) (ii). We disagree.

"On appeal, we review a trial court's finding that a parent has failed to rehabilitate herself in accordance with the rules that apply generally to a trier's finding of fact. We will overturn such a finding of fact only if it is clearly erroneous in light of the evidence in the whole record. . . . We do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. . . . [O]n review by this court every reasonable presumption is made in favor of the trial court's ruling."[9] (Citation omitted; internal quotation marks omitted.) *In re Vincent D.*, supra, 65 Conn. App. 669.

[9] It is well established that review of a trial court's determination that a parent has failed to achieve rehabilitation is governed by the clearly erroneous standard. See, e.g., *In re Jeisean M.*, 270 Conn. 382, 397, 852 A.2d 643 (2004); *In re Samantha C.*, supra, 268 Conn. 627; *In re Eden F.*, 250 Conn. 674, 705, 741 A.2d 873, reargument denied, 251 Conn. 924, 742 A.2d 364 (1999). "Appellate review of a factual finding . . . is limited both as a practical matter and as a matter of the fundamental difference between the role of the trial court and an appellate court." (Internal quotation marks omitted.) *Gorton* v. *Gorton*, 80 Conn. App. 52, 55, 832 A.2d 675 (2003). "The trial court's findings of fact are entitled to great deference and will be overturned only on a showing that they were clearly erroneous." *State* v. *Moreno-Cuevas*, 104 Conn. App. 288, 291, 934 A.2d 260 (2007), cert. denied, 287 Conn. 901, 947 A.2d 344 (2008). "Under this deferential standard, [w]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached." (Internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Ashford*, 98 Conn. App. 556, 560–61, 909 A.2d 964 (2006). Rather, "[i]n making this determination, every reasonable presumption must be given in favor of the trial court's ruling." (Internal quotation marks omitted.) *Blow* v. *Konetchy*, 107 Conn. App. 777, 788, 946 A.2d 943 (2008).

Although the dissent concedes in a footnote that the clearly erroneous standard of review is the applicable standard by which an appellate court reviews a trial court's determination that a parent has failed to achieve rehabilitation, its analysis does not apply that deferential standard. In granting review to the respondent's unpreserved due process challenge to the court's determination that he failed to achieve a sufficient degree of personal

rehabilitation, the dissent frames its analysis in terms of the respondent's "liberty interest" and, relying on Justice Thomas' concurring opinion in *Troxel* v. *Granville*, 530 U.S. 57, 80, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), strictly scrutinizes the record in a light most favorable to the respondent.

Appellate review of the respondent's due process challenge is unwarranted and improper. At no time did the respondent distinctly allege a due process claim before the trial court. See Practice Book § 60-5 (court not bound to consider claim "unless it was distinctly raised at the trial"). Rather, during closing argument, counsel for the respondent generally alleged that "his rights, as guaranteed by the fourteenth amendment to the United States constitution, have been violated." Indeed, the words "due process" never were uttered at trial, nor were they discussed in any motion or memorandum of law submitted to the court. Under our rules of practice, "[a]ny party intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief under Section 5-1 or state the question distinctly to the judicial authority on the record before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. If the party fails to do this, the judicial authority will be under no obligation to decide the question." Practice Book § 5-2; see also *Weinstein* v. *Weinstein*, 275 Conn. 671, 743, 882 A.2d 53 (2005). The respondent failed to comply with that rule of practice.

Most importantly, the trial court did not address the respondent's alleged due process claim in its memorandum of decision. The respondent thereafter did not seek an articulation of that decision. See Practice Book §§ 66-5 and 61-10. "We have repeatedly held that this court will not consider claimed errors on the part of the trial court unless it appears on the record that the question was distinctly raised at trial *and was ruled upon and decided by the court* adversely to the appellant's claim." (Emphasis added; internal quotation marks omitted.) *McGuire* v. *McGuire*, 102 Conn. App. 79, 87, 924 A.2d 886 (2007); see also *Crest Pontiac Cadillac, Inc.* v. *Hadley*, 239 Conn. 437, 444 n.10, 685 A.2d 670 (1996) (claims neither addressed nor decided by trial court are not properly before appellate tribunal); *Keating* v. *Glass Container Corp.*, 197 Conn. 428, 431, 497 A.2d 763 (1985) (same); *State* v. *Simms*, 170 Conn. 206, 208, 365 A.2d 821 (same), cert. denied, 425 U.S. 954, 96 S. Ct. 1732, 48 L. Ed. 2d 199 (1976); *State* v. *Kelly*, 100 Conn. 727, 729, 125 A. 95 (1924) ("so far as the record before us shows, the trial court never passed on the motion, and although assigned among the errors it is not properly before us"); *Atwood* v. *Jarrett*, 81 Conn. 532, 533, 71 A. 569 (1909) ("[t]he record nowhere . . . discloses that the claim embodied in the remaining assignment of error was . . . passed upon by the court below [and] therefore [it is] not properly before us for consideration"). Our Supreme Court has held that this rule "applies to constitutional issues." *Statewide Grievance Committee* v. *Whitney*, 227 Conn. 829, 846, 633 A.2d 296 (1993); *Berry* v. *Loiseau*, 223 Conn. 786, 828, 614 A.2d 414 (1992). Accordingly, the respondent's due process challenge to the court's determination that he failed to achieve a sufficient degree of personal rehabilitation is not properly before this court.

Failure to achieve a sufficient degree of personal rehabilitation is one of the seven statutory grounds on which parental rights may be terminated under § 17a-112 (j) (3). Section § 17a-112 (j) permits a court to grant a petition to terminate parental rights "if it finds by clear and convincing evidence that . . . the child . . . has been found by the Superior Court . . . to have been neglected . . . in a prior proceeding . . . and the parent of such child has been provided specific steps to take to facilitate the return of the child to the parent . . . and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child . . . ." In making that determination, the proper focus is on the parent's demonstrable development in relation to the needs of the child. As we have observed: "[I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue." (Internal

---

In reaching this unpreserved constitutional claim, the dissent ignores the fact that (1) the respondent did not distinctly raise the claim at trial as required by Practice Book § 5-2, (2) the trial court did not rule on that claim, (3) the respondent did not file either a motion for articulation with the trial court or a motion for review with this court, (4) the respondent has not requested review of the claim pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and (5) the respondent has not requested review under the plain error doctrine. See Practice Book § 60-5. "Connecticut law is clear that a party seeking review of unpreserved claims under either the plain error doctrine; Practice Book § 60-5; or *State* v. *Golding*, [supra, 239–40], must affirmatively request such review." *State* v. *Wheatland*, 93 Conn. App. 232, 243–44, 888 A.2d 1098, cert. denied, 277 Conn. 919, 895 A.2d 793 (2006); see also *State* v. *Ramos*, 261 Conn. 156, 171, 801 A.2d 788 (2002) ("[a] party is obligated . . . affirmatively to request review under [the *Golding* or plain error] doctrines"). As a result, "we do not engage in a level of review, such as *Golding* or plain error, when it has not been requested by a party." *State* v. *Longo*, 106 Conn. App. 701, 709, 943 A.2d 488 (2008). The dissent offers no explanation for its departure from those well established prerequisites to appellate review.

quotation marks omitted.) *In re Alejandro L.*, 91 Conn. App. 248, 260, 881 A.2d 450 (2005). Furthermore, our courts are required to construe liberally the provisions of § 17a-112 in the best interest of the child for whom a petition has been filed, rather than the parent thereof. See General Statutes § 17a-112 (q).

" 'Rehabilitate' means 'to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation.' Webster, Third New International Dictionary." *In re Juvenile Appeal (84-3)*, 1 Conn. App. 463, 477, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). Likewise, "[f]ailure to rehabilitate is defined as the failure of a parent to achieve expectations following the adjudication and disposition of the prior neglect petition." *In re Jessica M.*, 49 Conn. App. 229, 248, 714 A.2d 64 (1998), appeal dismissed, 250 Conn. 747, 738 A.2d 1087 (1999). Our review of the record reveals that the evidence credited by the court supports its conclusion that the respondent failed to attain a degree of rehabilitation sufficient to warrant the belief that at some time in the foreseeable future, he would be capable of assuming a responsible position with respect to the care of E.

The respondent's paternity was discovered months after the birth of E, her adjudication as a neglected child and her commitment to the custody of the petitioner. Both the respondent and the petitioner acknowledge that the term "reunification" is something of a misnomer, as E has been in the care of the department since she was one month old. Upon confirmation of his paternity of E, the respondent told the department that "he could not care for her due to his work schedule but would speak to his family about caring for her."[10]

---

[10] In its memorandum of decision, the court found that the respondent had "informed the department on two separate occasions that he may have relatives who would be willing to adopt [E]. Each time [the respondent] was asked for their names and contact information, he stated that he would need a few weeks to get the information together. Each time [the respondent]

At that time, the respondent had abandoned two daughters in Ghana and had no relationship with E. He thereafter voluntarily entered into an agreement with the department to take certain steps to improve his ability to care for E. Indulging every presumption in favor of the court's ruling, as we must, the court reasonably could determine that in agreeing to comply with the specific steps in light of the aforementioned parenting history, the respondent sought to restore himself to the position of a capable parent.[11] Pursuant to General Statutes § 46b-129 (j), the court provided the respondent with specific steps that included measures targeting the "identified treatment goals" regarding his parenting abilities.

The record indicates that the respondent's efforts largely were unsuccessful. As previously noted, the respondent failed to comply fully with several of the specific steps ordered by the court. See part I. That determination finds support in the social study for termination of parental rights that was offered into evidence and the testimony adduced at trial. In addition,

said he would obtain the information needed, he did not follow through." That finding is supported by the social study for termination of parental rights.

[11] In his appellate brief, the respondent questions precisely from what was he to be rehabilitated, a refrain repeated in the dissent. Under our rules of practice, it is the sole responsibility of the appellant to provide this court with an adequate record for review. Practice Book § 61-10. Practice Book § 66-5 permits an appellant to seek an articulation by the trial court of the factual and legal basis on which it rendered its decision. "[A]n articulation is appropriate where the trial court's decision contains some ambiguity or deficiency reasonably susceptible of clarification. . . . An articulation may be necessary where the trial court fails completely to state any basis for its decision . . . or where the basis, although stated, is unclear. . . . The purpose of an articulation is to dispel any . . . ambiguity by clarifying the factual and legal basis upon which the trial court rendered its decision, thereby sharpening the issues on appeal." (Citations omitted; internal quotation marks omitted.) *Fantasia* v. *Milford Fastening Systems*, 86 Conn. App. 270, 283, 860 A.2d 779 (2004), cert. denied, 272 Conn. 919, 866 A.2d 1286 (2005). Nevertheless, despite his puzzlement, the respondent failed to seek an articulation of the trial court's decision in the present case.

the respondent failed to comply with the department's instructions that he was not to have any contact with the mother and that he was not to allow E to have any contact with the mother. The respondent testified that he was aware of the mother's drug addiction and history with the department and the fact that failure to comply with the department's instructions could jeopardize his reunification with E. He nevertheless ignored those instructions. The court also had before it the statement of R, one of the mother's older children, that the respondent and the mother "were living together and planning to get married at the time of the respondent's reunification with E." Similarly, in the police report introduced into evidence, the mother referred to the respondent as "her boyfriend" and stated that she had her own key to the respondent's apartment.

In addition, the respondent exposed E to domestic violence.[12] The police report indicated that on the evening of that dispute, E was removed from the apartment *after* the altercation between the respondent and the mother. Also, E's foster mother testified that in the days following the domestic violence dispute, E recounted how her "daddy was screaming" because "he was bleeding." That testimony belies the respondent's statement that E was not present during the stabbing.[13] Further,

---

[12] We disagree with the dissent's factual finding attributing to the respondent a "clean record." First and foremost, "this court does not find facts." *Branford* v. *Van Eck*, 86 Conn. App. 441, 447, 861 A.2d 560 (2004), cert. denied, 272 Conn. 922, 867 A.2d 839 (2005). Second, the trial court found that prior to the birth of E, the respondent abandoned two minor children in Ghana, a finding the respondent does not contest on appeal. The court further found that months before the termination petition was filed, the respondent was arrested on charges of disorderly conduct and unlawful restraint stemming from the domestic violence dispute and that he engaged in substance abuse at that time. See footnote 2.

[13] In its memorandum of decision, the court indicated that it did not find the respondent's testimony credible. It stated: "The court questioned [the respondent] extensively during the trial and is mindful of the examination by others. At that time and also prevailing throughout the court's viewing of the evidence, the court has observed a reluctance of [the respondent] to respond in a forthright, positive manner. Rather, he responded in most

it supports the court's finding that the respondent "exhibited poor judgment in the upbringing of [E]."

The court was presented with ample evidence documenting the respondent's inability to interact with E. As social worker Lourdes Gerena testified, during the supervised visits prior to the domestic violence dispute, E "would shut down. She didn't show any emotion; she wouldn't interact with the respondent. She wouldn't look at him or really even let him touch her hand or anything." Multiple social workers present at those supervised visits confirmed that E cried throughout the visits and was unresponsive to the respondent.[14]

instances reluctantly with an inordinate amount of hesitation, pausing to seemingly prepare a response that he felt would curry favor in the particular situation but not necessarily truly factual. This was the distinct impression of the court, and this character of [the respondent] to somewhat fabricate, explains the impression this man had given to [department] workers and supervisors, counsel for the department and others to lead them down a path for proposing reunification for a long period. He put on a good facade for all, but beyond the front there was lacking a firm resolve to accomplish the satisfactory completion of the services in order to be able to serve as a safe, responsible and nurturing parent within a reasonable time."

We note that the police report indicates that on the evening of the domestic violence dispute, the respondent averred that the dispute was with "his girlfriend," who he claimed attacked him in his apartment. The respondent further stated that the mother was "not at his home when this argument happened." At trial, the respondent acknowledged that his statements were not truthful.

[14] We agree with the dissent's observation that the evidence in the record suggests the lack of an ongoing parent-child relationship. Although we agree that "punctilious adherence to procedural guidelines" is required in termination proceedings; *In re Vincent D.*, supra, 65 Conn. App. 668; we are also mindful that "whether to terminate parental rights is a highly fact-specific process." *In re Shane P.*, 58 Conn. App. 244, 254, 754 A.2d 169 (2000). In the present case, our analysis is predicated on a multitude of factors, including (1) the respondent's abandonment of his two minor children in Ghana; (2) the fact that upon confirmation of his paternity of E, the respondent told the department that "he could not care for her due to his work schedule"; (3) the respondent's failure to comply fully with several of the specific steps ordered by the court; (4) the respondent's failure to comply with the department's instructions that he was not to have any contact with the mother and that he was not to allow E to have any contact with the mother; (5) the fact that the respondent and the mother were planning to get married

Following the domestic violence dispute, the department arranged five supervised visits between the respondent and E. The respondent cancelled the visits scheduled on May 11, 2006, and June 1, 2006. During the visits that he attended, E exhibited a fear of the respondent. A social worker present at one of those visits stated that E "totally shut down and cried in the respondent's presence. She appeared frightened, uneasy, would not respond and would not interact with the respondent throughout the visit. E shook her head 'no' when asked if she wanted to have any more visits with the respondent." Another social worker described the visits to the court as "the saddest visits I've ever seen."

The court also was presented with evidence concerning the respondent's children in Ghana, whom it found he had abandoned in 2000 and "has not seen them since."[15] In assessing rehabilitation, the court is required

at the time of the respondent's reunification with E; (6) the fact that the respondent exposed E to domestic violence; (7) the respondent's inability to interact with E; and (8) the testimony of psychologist Kelly F. Rogers, who opined that he questioned the respondent's fitness as a parent. Considering those factors under the applicable standard or review, which requires this court to make every reasonable presumption in favor of the trial court's ruling; *In re Vincent D.*, supra, 669; we cannot say that it was clearly erroneous for the court to conclude that the respondent had failed to attain a degree of rehabilitation sufficient to warrant the belief that at some time in the foreseeable future, he would be capable of assuming a responsible position with respect to the care of E.

[15] The respondent has not disputed that factual finding on appeal and made no mention of his Ghanaian children in either his appellate brief or at oral argument before this court. In questioning, sua sponte, that finding in footnote 6 of its opinion, the dissent fails to accord appropriate deference to the trial court as "the appropriate forum for the resolution of factual disputes"; *First National Bank of Litchfield* v. *Miller*, 285 Conn. 294, 302, 939 A.2d 572 (2008); in derogation of the "well established [principle] that [appellate] review is limited to claims raised by the parties in their briefs." *Payton* v. *Payton*, 103 Conn. App. 825, 841, 930 A.2d 802 (*Schaller, J.,* concurring), cert. denied, 284 Conn. 934, 935 A.2d 151 (2007). In so doing, the dissent credits the testimony of the respondent despite the fact that the trial court, as the sole arbiter of credibility, found him not credible. See footnote 13 of this opinion; see also *In re Davonta V.*, 285 Conn. 483, 488–89,

to obtain a historical perspective of the respondent's child caring and parenting abilities. *In re Daniel C.*, 63 Conn. App. 339, 354, 776 A.2d 487 (2001). The court heard detailed testimony from the respondent regarding his relationship with his daughters. As it stated in its memorandum of decision: "[T]he court questioned [the respondent] at length with regard to his relationship with his two daughters who are living in Ghana with their maternal grandmother. [The respondent] left Ghana in 2000 when his daughter, [J], was two years old and is now eight years old and his daughter, [P], was four years old and is now ten years old. He has not seen these children in six years, talks to them occasionally on the telephone and from time to time sends small sums of money to them. While he has had an income since 2000 and has seemingly had no obligation to anyone other than himself until August 18, 2004, when his paternity of [E] was determined, he has offered little, if any, support to those two children. He never attempted to bring his daughters to this country even for a visit nor saw fit to visit with them in Ghana." In light of that historical perspective, the court concluded

940 A.2d 733 (2008) (appellate tribunal does not retry facts or pass on credibility of witnesses); *Gallo* v. *Gallo*, 184 Conn. 36, 38, 440 A.2d 782 (1981) ("[w]eighing the evidence and judging the credibility of the witnesses is the function of the trier of fact and this court will not usurp that role"); *Highstead Foundation, Inc.* v. *Fahan*, 105 Conn. App. 754, 762, 941 A.2d 341 (2008) ("[i]t is the function of the trial court to weigh the evidence and the credibility of the parties and to find the facts; we cannot retry the case on appeal" [internal quotation marks omitted]); *Feen* v. *New England Benefit Cos.*, 81 Conn. App. 772, 780, 841 A.2d 1193 ("[i]n recognition of its superior position to evaluate those factors as they coalesce at trial and the disparate ability of a reviewing court to glean such things from the written record, we have held that the trial court is vested with the sole discretion to make credibility assessments and to assign the weight to be given testimony"), cert. denied, 269 Conn. 910, 852 A.2d 739 (2004). Although the dissent states that the record does not provide enough information about the circumstances of the respondent and his family in Ghana to determine whether his abandonment of the minor children "is relevant to his ability to raise E," the trial court expressly concluded otherwise.

that "[i]t is remarkable to the court that [the respondent's] inattention to his two daughters in Ghana can be reconciled with a serious intention to father [E]."

The court also heard the testimony of psychologist Kelly F. Rogers. "Courts are entitled to give great weight to professionals in parental termination cases." *In re Christina V.*, 38 Conn. App. 214, 221, 660 A.2d 863 (1995); see also *In re Shyliesh H.*, 56 Conn. App. 167, 176, 743 A.2d 165 (1999) ("[p]sychological testimony from professionals is appropriately accorded great weight in termination proceedings"). Rogers evaluated the respondent and E in July, 2005, during which he conducted interactional studies of the child with the respondent, as well as with her foster parents. Rogers testified that although he originally recommended reunification of the respondent with E in August, 2005, he opposed it at the time of trial. Rogers based his opinion on a variety of factors that included (1) the respondent's lack of a relationship with E, (2) the respondent's ongoing relationship with the mother, (3) the domestic violence dispute, (4) the respondent's substance abuse that was documented in the police report, (5) E's strong bond with her foster family and the "risk of trauma of another removal," (6) his concerns about E's long-term emotional and social development, and (7) his concerns about the respondent's credibility and "ability to correctly report to authorities on the status of his daughter." As a result, Rogers testified that he questioned the respondent's fitness as a parent.

In its summary of the adjudicatory findings, the court stressed the respondent's "inability to parent E even after extensive participation in the services made available" and his "poor judgment in the upbringing" of E. It found that "[t]he clear and convincing evidence indicates that [the respondent has] failed to improve [his] parenting ability to acceptable standards. . . . [D]espite [the department's] efforts on [his] behalf and

[his] own efforts, [the respondent remains] incapable of providing a safe and nurturing environment for [his] child. When one considers the level of care, patience and discipline that children require from their caregivers, it is patently clear that [the respondent is] not in a better position to parent [E] now than [he was] at any other time during these proceedings, and that [he remains] without the qualities necessary to successfully parent [E]."[16] It therefore found that considering E's age, needs and special needs, the respondent could not within a reasonable time assume a responsible position in the child's life.

It is well settled that the critical issue in assessing rehabilitation is whether the parent has gained the ability to care for the particular needs of the child at issue. *In re Halle T.*, 96 Conn. App. 815, 836, 902 A.2d 670 (2006); *In re Alejandro L.*, supra, 91 Conn. App. 260; *In re Kristy A.*, 83 Conn. App. 298, 317, 848 A.2d 1276, cert. denied, 271 Conn. 921, 859 A.2d 579 (2004); *In re Ashley M.*, 82 Conn. App. 66, 72, 842 A.2d 624 (2004); *In re Victoria B.*, 79 Conn. App. 245, 255, 829 A.2d 855 (2003); *In re Amneris P.*, 66 Conn. App. 377, 384, 784 A.2d 457 (2001); *In re Gary B.*, 66 Conn. App. 286, 292, 784 A.2d 412 (2001); *In re Daniel C.*, supra, 63 Conn. App. 354; *In re Sheila J.*, 62 Conn. App. 470, 480, 771 A.2d 244 (2001); *In re Sarah Ann K.*, 57 Conn. App. 441, 448, 749 A.2d 77 (2000); *In re Shyliesh H.*, supra, 56 Conn. App. 180; *In re Danuael D.*, 51 Conn. App. 829, 840, 724 A.2d 546 (1999). The record amply supports the conclusion that the respondent has not gained that

---

[16] After acknowledging the "limited parenting skills" of the respondent, the dissent opines that "this is not a condition from which he had to be rehabilitated." It cites no authority to support that assertion. If the inquiry under § 17a-112 (j) (3) (B) (ii) centers on whether "considering the age and needs of the child, such parent could assume a responsible position in the life of the child," we perceive no reason why the inability to parent a child cannot, in certain circumstances, constitute such a condition.

essential ability. Indulging every reasonable presumption in favor of the court's ruling, as our standard of review requires, we conclude that the evidence credited by the court supports its conclusion that the respondent failed to attain a degree of rehabilitation sufficient to warrant the belief that at some time in the foreseeable future, he would be capable of assuming a responsible position with respect to the care of E, as required by § 17a-112 (j) (3) (B) (ii).

The judgment is affirmed.

In this opinion BISHOP, J., concurred.

McLACHLAN, J., dissenting. Termination of parental rights has been called the civil equivalent of the death penalty. See *Matter of Parental Rights as to A.J.G.*, 122 Nev. 1418, 1423, 148 P.3d 759 (2006). "The termination of parental rights is defined as the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent . . . . It is a most serious and sensitive judicial action. *Anonymous* v. *Norton*, 168 Conn. 421, 430, 362 A.2d 532, cert. denied, 423 U.S. 935, 96 S. Ct. 294, 46 L. Ed. 2d 268 (1975). Although that ultimate interference by the state in the parent-child relationship may be required under certain circumstances, the natural rights of parents in their children undeniably warrants deference and, absent a powerful countervailing interest, protection." (Citation omitted; internal quotation marks omitted.) *In re Juvenile Appeal (Anonymous)*, 181 Conn. 638, 640, 436 A.2d 290 (1980).

The Supreme Court of the United States has long recognized this fundamental right of parents. Writing for the majority in *Troxel* v. *Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000), Justice O'Connor stated: "The Fourteenth Amendment provides that no

State shall deprive any person of life, liberty, or property, without due process of law. We have long recognized that the Amendment's Due Process Clause, like its Fifth Amendment counterpart, guarantees more than fair process. . . . The Clause also includes a substantive component that provides heightened protection against government interference with certain fundamental rights and liberty interests." (Citation omitted; internal quotation marks omitted.) Id., 65. "The liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court." Id. Thus, any statute which interferes with the parent's right to raise a child free from interference of the state as well as any procedure implementing it will be subject to strict scrutiny.[1] Id., 80 (Thomas, J., concurring).

I agree with the trial court and the majority that the department of children and families (department) made reasonable efforts to reunify the minor child, E, with

[1] Generally, when a statutory classification affects a fundamental liberty interest, that statute is subject to strict scrutiny. See *Keogh* v. *Bridgeport*, 187 Conn. 53, 66, 444 A.2d 225 (1982). In the present case, the parties do not assert, nor do I, that the statute in this case should be examined or challenged. I simply emphasize the fundamental nature and importance of a parent's right to raise his or her children, which, because of the statutory scheme, must be properly applied. I agree with the majority that in the present case, the court's decision is governed by the clearly erroneous standard of review. I am of the opinion, however, that a mistake was committed. See *Shapero* v. *Mercede*, 66 Conn. App. 343, 346–47, 784 A.2d 435 (2001) ("A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . The conclusions drawn by the trial court will be upheld unless they are legally and logically inconsistent with the evidence." [Citation omitted; internal quotation marks omitted.]), rev'd on other grounds, 262 Conn. 1, 808 A.2d 666 (2002). Here, the evidence does not support a finding of failure to rehabilitate.

the respondent father and that he was unwilling or unable to benefit from such efforts, and I agree that a termination of the respondent's parental rights is in the child's best interest. I regrettably cannot agree, however, with the conclusion that the respondent's parental rights appropriately were terminated on the stated statutory ground of failure to achieve personal rehabilitation.[2] If the state is going to intervene and terminate an individual's parental rights, it is paramount that the state allege and prove the appropriate statutory ground.

"Compliance with the statutory criteria for termination cannot be dismissed by an all-encompassing best interests standard. *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 672, 420 A.2d 875 (1979). Insistence upon strict compliance with the statutory criteria before termination of parental rights and subsequent adoption proceedings can occur is not inconsistent with concern for the best interests of the child. Rather, it enhances the child's best interests by promoting autonomous families and by reducing the dangers of arbitrary and biased decisions amounting to state intrusion disguised under the rubric of the child's best interests. Id. *[T]he risk that judges or social workers will be tempted, consciously or unconsciously, to compare unfavorably the material advantages of the child's natural parents with those of prospective adoptive parents and therefore to reach a result based on such comparisons rather than on the statutory criteria requires the court, in considering a petition to terminate parental rights, to sever completely the issue of whether termination is statutorily warranted and whether a proposed adoption is desirable . . . .*" (Citation omitted; emphasis

---

[2] A reversal of the judgment here would not automatically reunify E with the respondent; rather, she would remain committed to the custody of the petitioner until the petitioner petitioned the court for termination of the respondent's parental rights on the proper statutory ground or made an appropriate permanency plan.

added; internal quotation marks omitted.) *In re Juvenile Appeal*, 1 Conn. App. 463, 467, 473 A.2d 795, cert. denied, 193 Conn. 802, 474 A.2d 1259 (1984). While it may have been in the best interest of E that the court terminated the respondent's parental rights, it is in the best interest of the public that the petitioner, the commissioner of children and families, select the appropriate statutory ground. Here, the court applied an improper statutory ground, which was alleged by the petitioner, in order to do what was in the best interest of E.

The respondent argues that the termination of his parental rights on the sole basis that he failed to achieve a sufficient degree of personal rehabilitation as would encourage a belief that within a reasonable time, considering the age and needs of the child, he could assume a responsible position in the life of the child, denied him due process.[3] That claim is supported by the follow-

---

[3] The respondent's first issue on appeal was that "[t]he trial court erred in finding that the respondent father had failed to rehabilitate. . . . The respondent father was not accorded his due process rights as provided by the due process clause of the fourteenth amendment to the United States Constitution." The respondent further enunciated his due process argument in his brief before this court.

Although the majority has determined that the respondent's due process claim is not preserved, I believe that the claim is preserved and should be addressed due to the fundamental right involved in the present case.

Practice Book § 5-2 provides: "Any party intending to raise any question of law which may be the subject of an appeal must either state the question distinctly to the judicial authority in a written trial brief under Section 5-1 or state the question distinctly to the judicial authority on the record before such party's closing argument and within sufficient time to give the opposing counsel an opportunity to discuss the question. If the party fails to do this, the judicial authority will be under no obligation to decide the question." The respondent satisfied Practice Book § 5-2.

In his closing argument at trial, the respondent asserted "his position that his rights, as guaranteed by the fourteenth amendment to the United States constitution, have been violated." He made this argument by stating that the department conducted a background check, in which it found that he did not have a criminal history and did not have a history with the department.

The following language excerpted from the respondent's closing argument expands on his due process claim: "[A] police report of a single incident of

ing facts in the record. At the time the respondent was identified as E's father, he had a clean record. He had no history of substance abuse, no criminal history, no history of domestic violence, no history with the department, and he was gainfully employed and had housing during most of the time in question. In fact, E's social worker testified that the respondent had a "clean record" and that she did not make referrals for a sub-

domestic violence. That is not a failure to rehabilitate. Rehabilitate means to restore to a prior level. [The respondent] doesn't have any history of domestic violence. . . . [The department social worker] said there was no concern about substance abuse. She never made a referral for an evaluation in the two years that they were working on sending [E] home. No evidence of alcohol abuse at all. . . . In any event, he submitted to the substance abuse [testing], and it was negative. Both urine screens and the hair test were negative. So, he's not rehabilitating from substance abuse. . . . *This is a violation of our laws.* There's one ground for termination, and that's failure to rehabilitate. When asked from what [the respondent] was rehabilitating, [another social worker from the department] had trouble identifying it. I believe she said, well, ah—I guess severe domestic violence or maybe substance abuse. But it can't be either one of those." (Emphasis added.)

Furthermore, Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ." The predecessor to Practice Book § 60-5, before it was amended in 1979, provided: "The supreme court shall not be bound to consider any errors on an appeal unless they are specifically assigned or claimed and unless it appears on the record that the question was distinctly raised at the trial *and was ruled upon and decided by the court* adversely to the appellant's claim, or that it arose subsequent to the trial." (Emphasis added.) Therefore, even though the majority claims that unless the issue is distinctly raised and *decided* by the court, it is not preserved and review is precluded absent review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), or plain error review, I believe it was sufficiently raised. Furthermore, Practice Book § 60-5 does not preclude a claim that was raised imperfectly from being reviewed; it merely states that the court is not bound to afford it review.

Moreover, the petitioner did not object to the respondent's due process argument by claiming that it was not preserved; rather, the petitioner asserted only that the claim was briefed inadequately. The respondent's due process claim, however, is ten pages long, and the respondent has analyzed his claim and provided case law in support of such claim. See generally *State* v. *Linarte*, 107 Conn. App. 93, 118, 944 A.2d 369 (2008).

stance abuse evaluation previous to returning E to him because she was not concerned about substance abuse.[4]

The petitioner sought to terminate the respondent's parental rights on the basis of a failure to achieve a sufficient degree of rehabilitation pursuant to General Statutes § 17a-112 (j) (3) (B) (ii). "Rehabilitate" means to restore a handicapped or delinquent person to a useful and constructive place in society through social rehabilitation. *In re Heather L.*, 49 Conn. Sup. 287, 308, 877 A.2d 27 (2004), aff'd, 274 Conn. 174, 874 A.2d 796 (2005). Webster's defines "rehabilitate" as "to restore to a former capacity . . . to restore to good repute . . . ." Merriam-Webster's Collegiate Dictionary (10th Ed. 1993). Numerous Connecticut decisions have used the language that "[p]ersonal rehabilitation as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent." (Internal quotation marks omitted.) *In re Alejandro L.*, 91 Conn. App. 248, 259, 881 A.2d 450 (2005).[5] Moreover,

---

[4] During the reunification process, however, the respondent, when he had custody of E, was involved in a domestic violence altercation with E's mother in which he reportedly consumed alcohol to the point of inebriation and was stabbed. While I make no excuses for such reckless behavior, it nevertheless does not indicate a pattern of substance abuse or domestic violence from which the respondent needed to be rehabilitated.

[5] See *In re Nasia B.*, 98 Conn. App. 319, 908 A.2d 1090 (2006) (court affirmed termination of mother's parental rights on several grounds, including failure to rehabilitate because mother had history of substance abuse and mental health issues, and chose to attend sporadically various programs and take advantage of opportunities to address both of those issues as well as her parenting skills); see also *In re Shaun B.*, 97 Conn. App. 203, 903 A.2d 246 (2006) (court affirmed termination of mother's parental rights on basis of failure to rehabilitate when mother had anger management and mental health issues, and did not take advantage of specific steps and programs offered that would have addressed issues); *In re Vanna A.*, 83 Conn. App. 17, 847 A.2d 1073 (2004) (court affirmed termination of mother's parental rights on ground of failure to rehabilitate because mother had been arrested several times, incarcerated, there were abuse allegations, and court found mother's continued involvement in criminal justice system and lack of progress in therapy demonstrated inability to reunify with child).

courts in other states have determined that rehabilitation is "remov[ing] the circumstances, conditions, or conduct that caused the parent's inability or unwillingness to properly care for the child." *M.E. v. Shelby County Dept. of Human Resources*, 972 So. 2d 89, 102 (Ala. Civ. App. 2007).

Whatever definition is used, all have in common the concept of restoration from something. Here, the respondent poses the question: from what was he to be rehabilitated? The record in this case does not support the fact that the respondent suffered from some condition or disability from which he needed to be restored or rehabilitated. Admittedly, he had limited parenting skills, but this is not a condition from which he had to be rehabilitated. In order to prove a failure to achieve rehabilitation as a ground for termination of parental rights, a two-pronged test for rehabilitation must be satisfied: The state must prove by clear and convincing evidence that the parent has failed to achieve rehabilitation and that there is no reason to believe that a parent could assume a responsible position in the life of a child within a reasonable time, considering the child's age and needs. See General Statutes § 17a-112 (j) (3) (B); *In re Danuael D.*, 51 Conn. App. 829, 843, 724 A.2d 546 (1999); see generally *In re Migdalia M.*, 6 Conn. App. 194, 203, 504 A.2d 533, cert. denied, 199 Conn. 809, 508 A.2d 770 (1986); *In re Heather L.*, supra, 49 Conn. Sup. 308.[6]

---

[6] The majority states that the respondent should have filed a motion for articulation if he was unclear as to the grounds for his failure to rehabilitate. In its opinion, however, the majority appears to conclude that the respondent's failure to rehabilitate was supported by the court's finding that he had abandoned his two daughters in Ghana when he first came to the United States and his involvement in a domestic violence incident in which he had been stabbed. The respondent testified that he was trying to work with immigration authorities to bring his daughters to the United States. He also informed the court that he spoke with his daughters on a regular basis. While the court found it "remarkable" that the respondent had been so inattentive to his daughters in Ghana, the facts and circumstances surrounding his departure from Ghana, leaving his daughters behind, are unclear. Moreover, neither the petitioner nor the court claimed that the

The majority relies on *In re Alejandro L.* and particularly language in which the court stated: "[I]n assessing rehabilitation, the critical issue is not whether the parent has improved [her] ability to manage [her] own life, but rather whether [she] has gained the ability to care for the particular needs of the child at issue."[7] (Internal quotation marks omitted.) *In re Alejandro L.*, supra, 91

respondent, in order to reunify with E, should have taken measures to bring his other daughters to the United States. I am not attacking the finding of the court that the respondent abandoned his daughters in Ghana. I raise this issue because the record does not provide us with enough information about the circumstances of the respondent and his family in Ghana for us to determine whether leaving his children in another country, more than six years earlier, is relevant to his ability to raise E.

[7] *In re Alejandro L.* is but one example of a litany of cases in which the facts clearly demonstrate the conditions from which the parent failed to rehabilitate. There, the respondent was discharged repeatedly from substance abuse, mental health and domestic violence counseling. *In re Alejandro L.*, supra, 91 Conn. App. 250–53. For example, the respondent was admitted to Manchester Memorial Hospital for attempted suicide and was admitted to River East, the intensive outpatient treatment program at Natchaug Hospital, but was discharged for not attending her therapy sessions. Id., 252. She was then referred to an outpatient program with Hockanum Community Valley counseling outpatient mental health and substance abuse treatment center (Hockanum Valley), but was once again discharged because of her failure to attend programs. Id.

After the court adjudicated all of her four children neglected, she began receiving counseling from Hockanum Valley but once again was discharged for failure to attend programs. Id. Additionally, she failed to report for drug testing and, when she was tested, the test indicated that she had recently used drugs. Id., 252–53. She was arrested for burglary and was admitted to River East again but was subsequently discharged for failure to comply with recommended treatment for cocaine addiction. Id., 253. She also refused to attend recommended intensive treatment at the Teamworks partial hospitalization program, saying instead that she intended to enroll in a New Direction program but failed to enroll. Id. She was then referred for the third time to another intake appointment at Hockanum Valley and, for the third time, was discharged for failure to comply with the program. Id. The department referred her to Stafford Family Services for counseling and provided transportation, but she failed to attend. Id., 254. There was a domestic violence protective order entered in her favor against L, the children's father, but she chose to live with him. Id. Last, her burglary charge resulted in a criminal conviction with probation requiring her to attend substance abuse counseling with which she failed to comply. Id. The facts of all of the cases used as precedent support the position of this dissent that "failure to rehabilitate" is not appropriate in this case.

Conn. App. 260. The majority's use of this language changes the meaning of the termination ground from "failure to rehabilitate" to "[gaining] the ability to care for the particular needs of the child at issue." (Internal quotation marks omitted.) Id.

The actual petition for termination of parental rights is a preprinted form on which the jurisdictional facts and grounds are set forth with a number of boxes to be checked when applicable. In the space reserved for grounds of termination, the form has the seven grounds set forth in § 17a-112 (j). For each of the seven subcategories there is box. The only box checked in this case was that next to the language for ground (B), the so-called failure to rehabilitate ground. No other box was checked. Evidence in the record may have supported several other grounds, such as ground (D), which is that there is no ongoing parent-child relationship. The procedure to prepare a termination of parental rights petition is simple, but the parent-child relationship is so important that great care and attention should be taken to ensure that viable grounds of termination, if they exist, are alleged. Unfortunately, the effort was not made to match the facts and evidence of this case to the statutory grounds, nor was any motion ever made to amend the petition to allege viable grounds.

"Pleadings are intended to limit the issues to be decided at the trial of a case and [are] calculated to prevent surprise. . . . [The] purpose of pleadings is to frame, present, define, and narrow the issues and to form the foundation of, and to limit, the proof to be submitted at trial . . . ." (Citations omitted; internal quotation marks omitted.) *Birchard* v. *New Britain*, 103 Conn. App. 79, 83, 927 A.2d 985, cert. denied, 284 Conn. 920, 933 A.2d 721 (2007). Practice Book § 33a-1 (a), concerning the initiation of judicial proceedings for the termination of parental rights, provides in relevant part: "The petitioner shall set forth with reasonable

particularity, *including statutory references*, the specific conditions which have resulted in the situation which is the subject of the petition." *(*Emphasis added.*)* The facts adduced at this trial do not support, in my opinion, a finding by clear and convincing evidence that the respondent has failed to rehabilitate. A reasonable person in the respondent's position when presented with this petition would not have the belief that he would have his relationship with his child completely severed. In this case, it is not the finding of facts that is clearly erroneous but the application of the law. The improper statutory ground was alleged.

The department checked the wrong box.

I respectfully dissent.